IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

COLE NOELDNER,

        Plaintiff,

                                      Case No. 21-CV-00244

    v.

TAYLOR COUNTY, BRUCE DANIELS (Former
Sheriff of Taylor County), SHERIFF LARRY
WOEBBEKING, LOGAN SCOLES, AARON
BERNAS, RHONDA SACKMAN, JOHN DOES 1-
10, BAILEE CHEEVER, WISCONSIN COUNTY MUTUAL
INSURANCE COMPANY, and ABC INSURANCE COMPANY,

        Defendants.

**TAYLOR COUNTY, BRUCE DANIELS, SHERIFF LARRY WOEBBEKING,
LOGAN SCOLES, AARON BERNAS, RHONDA SACKMAN AND
WISCONSIN COUNTY MUTUAL INSURANCE COMPANY'S PROPOSED
FINDINGS OF FACT IN SUPPORT OF SUMMARY JUDGMENT**

Defendants Taylor County, Bruce Daniels, Sheriff Larry Woebbeking, Logan Scoles, Aaron Bernas, Rhonda Sackman and Wisconsin County Mutual Insurance Company, by their attorneys, Crivello Carlson, S.C., respectfully submit the following Proposed Findings of Fact in support of their Motion for Summary Judgment.

1.     On April 28, 2018, Plaintiff was booked into the Taylor County Jail ("TCJ"). (Dec. of Woebbeking, ¶ 5.)

2.     Bailee Cheever was employed by Taylor County as a corrections officer at TCJ from June 23, 2016 to September 20, 2018. (Dec. of Woebbeking, ¶ 6.)

3.      Chief Deputy Woebbeking did not personally witness any interactions between Cole Noeldner and Bailee Cheever between April 28, 2018 through September 20, 2018. (Dec. of Woebbeking, ¶ 7.)

4.      From April 28, 2018 through September 20, 2018, Defendant Cheever worked the night shift at Taylor County Jail from 10:00 p.m. to 6:30 a.m. (Dec. of Woebbeking, ¶ 8.)

5.      There were always at least three officers assigned to work each shift at TCJ during the relevant time period. (Dec. of Bernas, ¶ 25; Dec. of Sackman, ¶ 26; Dec. of Woebbeking, ¶ 9.)

## TRAINING

6.      During the relevant time period, newly hired corrections officers were required to participate in 6-week period of field training during which the newly hired officer shadows and is trained by one or more designated field training officers. (Dec. of Scoles, ¶ 11; Dec. of Bernas, ¶ 6; Dec. of Sackman, ¶ 5; Dec. of Woebbeking, ¶ 12.)

7.      During field training, newly hired corrections officers read and review the procedures for various tasks; the assigned field training officer explains and demonstrates those tasks; the newly hired corrections officer explains the procedures for the tasks while his or her field training officer demonstrates the tasks; the new hire practices completing each task according to the procedures; and the new hire demonstrates his or her proficiency for each task. (Dec. of Scoles, ¶ 12; Dec. of Bernas, ¶ 10; Dec. of Sackman, ¶ 7; Dec. of Woebbeking, ¶ 13.)

8.      During field training, newly hired corrections officers are trained on appropriate interactions and relationships with citizens in general, with other department members,

and with inmates. This includes training on how to avoid fraternization with inmates. (Dec. of Scoles, ¶ 13; Dec. of Bernas, ¶ 11; Dec. of Sackman, ¶ 8; Dec. of Woebbeking, ¶ 14.)

9. During the relevant time frame, Taylor County Jail had a Prison Rape Elimination policy ("PREA policy") in place that established a zero-tolerance policy for sexual abuse and sexual harassment between inmates, between corrections officers, and between inmates and corrections officers. (Dec. of Scoles, ¶ 14; Dec. of Bernas, ¶ 14; Dec. of Sackman, ¶ 13; Dec. of Woebbeking, ¶ 15.)

10. During field training, newly hired corrections officers are trained on the applicable portions of Taylor County Sheriff's Office's policy manual. At the completion of the field training program, all new hires are aware of and familiar with the Jail's "Prison Rape Elimination" policy. (Dec. of Scoles, ¶ 15; Dec. of Bernas, ¶ 15; Dec. of Sackman, ¶ 14; Dec. of Woebbeking, ¶ 16.)

11. TCJ's PREA policy states that staff "shall report immediately" any "knowledge, suspicion, or information" regarding 1) incidents of sexual abuse or harassment that occurs in the Temporary Holding Facility; 2) retaliation against detainees or staff who report such incidents; and 3) any neglect or violation of responsibilities on the part of any staff member that may have contributed to an incident or retaliation. (Dec. of Woebbeking, ¶ 17.)

12. During field training on the Jail's Prison Rape Elimination policy, newly hired corrections officers are trained that inmates have a right to be free of sexual abuse and

sexual harassment. (Dec. of Scoles, ¶ 16; Dec. of Bernas, ¶ 16; Dec. of Sackman, ¶ 15; Dec. of Woebbeking, ¶ 18.)

13.     During field training on the Jail's Prison Rape Elimination policy, newly hired corrections officers are trained on the prevention and detection of sexual abuse and sexual harassment within the Taylor County Jail. (Dec. of Scoles, ¶ 17; Dec. of Bernas, ¶ 17; Dec. of Sackman, ¶ 16-17; Dec. of Woebbeking, ¶ 19.)

14.     During field training on the Jail's Prison Rape Elimination policy, newly hired corrections officers are trained on communicating effectively and professionally with all inmates within the Taylor County Jail. (Dec. of Scoles, ¶ 18; Dec. of Bernas, ¶ 18; Dec. of Woebbeking, ¶ 20.)

15.     As a result of field training on the Jail's Prison Rape Elimination policy, all TCJ corrections officers are aware of and understand the fact that the Taylor County Sheriff's Office had a zero-tolerance policy toward all forms of sexual abuse and sexual harassment. (Dec. of Scoles, ¶ 19; Dec. of Bernas, ¶ 19; Dec. of Sackman, ¶ 18; Dec. of Woebbeking, ¶ 21.)

16.     As a result of field training on the Jail's Prison Rape Elimination policy, all TCJ corrections officers are aware of and understand the fact that sexual contact between a corrections officer and an inmate, with or without consent, constitutes sexual abuse. (Dec. of Scoles, ¶ 20; Dec. of Bernas, ¶ 20; Dec. of Sackman, ¶ 19; Dec. of Woebbeking, ¶ 22.)

17.     As a result of field training on the Jail's Prison Rape Elimination policy, all TCJ corrections officer are aware of and understand the fact that any type of consensual

sexual activity or contact between correctional staff and inmates is prohibited, even when no objections are raised or the contact otherwise appears to be consensual. (Dec. of Scoles, ¶ 21; Dec. of Bernas, ¶ 21; Dec. of Sackman, ¶ 20; Dec. of Woebbeking, ¶ 23.)

18.     All newly hired corrections officers are trained and made aware that sexual contact of any kind between an inmate and a corrections officer is prohibited by the Jail's policies and is, in fact, illegal. (Dec. of Scoles, ¶ 22; Dec. of Bernas, ¶ 22; Dec. of Sackman, ¶ 21; Dec. of Woebbeking, ¶ 24.)

19.     Defendant Cheever, Officer Scoles, Officer Sackman, and Officer Bernas all successfully completed the field training process upon being hired. (Dec. of Woebbeking, ¶ 12.)

20.     During the relevant time frame, in addition to regular inservice training, Taylor County Jail administrators regularly provided informal reminders and training about the importance of avoiding fraternization and about the Jail's Prison Rape Elimination policy. (Dec. of Scoles, ¶ 23; Dec. of Bernas, ¶ 23; Dec. of Sackman, ¶ 22; Dec. of Woebbeking, ¶ 25.)

21.     TCJ has a specific policy pertaining to staff and inmate contact. All newly hired corrections officers are trained on this policy when they are hired. In part, it states that staff shall not become overly familiar with inmates and shall not engage in sexual acts or salacious conversations and shall not exchange inappropriate notes or letters with inmates. Staff are required to promptly report all attempts by inmates to initiate sexual acts. (Dec. of Bernas, ¶ 27; Dec. of Sackman, ¶ 23; Dec. of Woebbeking, ¶ 26.)

22.     TCJ's policy on Standards of Conduct confirms that it is a "cause for discipline" for employees to solicit or engage in on-duty sexual activity with inmates. (Dec. of Bernas, ¶ 28; Dec. of Sackman, ¶ 24; Dec. of Woebbeking, ¶ 27.)

23.     TCJ's policy on Standards of Conduct states that it is a "cause for discipline" where a staff member fails to promptly and fully report "activities on his/her part or the part of any other member where such activities … may result in criminal prosecution or discipline under this policy" or for failing to promptly and fully report "any other on-duty conduct which any member knows or reasonably should know is unbecoming of a member of this agency, is contrary to good order, efficiency or morale, or tends to reflect unfavorably upon this office or its members." (Dec. of Woebbeking, ¶ 28.)

24.     During the relevant time period, all newly hired corrections officers must agree to follow the Wisconsin Jail Officer Code of Ethics, which is based on Wisconsin Administrative Code Section LES 3.01(2)(h). (Dec. of Woebbeking, ¶ 29.)

25.     During the relevant time period, all officers hired by Taylor County as corrections officers were required to complete a 160-hour course in jail officer basic training through a training school certified by the Wisconsin Department of Justice Law Enforcement Standards Board. The topics of coursework and study are dictated by the Law Enforcement Standards Board. (Dec. of Woebbeking, ¶ 30.)

26.     If not already completed at the time of hire, all officers hired by Taylor County as corrections officers were required to complete the above referenced 160-hour course in jail officer basic training within two years of the officer's date of hire, as set forth in

Wisconsin Administrative Code §§ LES 3.01(1)(c) and 3.01(2)(c). (Dec. of Woebbeking, ¶ 31.)

27.     Defendant Cheever, Officer Scoles, and Officer Bernas had all completed a 160-hour course in jail officer basic training through a training school certified by the Wisconsin Department of Justice Law Enforcement Standards Board on or before June 7, 2018. (Dec. of Woebbeking, ¶ 11; Dkt. No. 44, ¶ 10; Dec. of Bernas, ¶ 3; Dec. of Scoles, ¶ 4.)

28.     Officer Sackman completed a 160-hour course in jail officer basic training through a training school certified by the Wisconsin Department of Justice Law Enforcement Standards Board on February 8, 2019. (Dec. of Sackman, ¶ 3.)

29.     On May 31, 2018, Officer Sackman completed three hours of PREA-related training required and provided by Taylor County Jail. (Dec. of Sackman, ¶ 4; Dec. of Woebbeking, ¶ 80, Ex. I.)

30.     On April 2, 2018, Officer Bernas completed 90 minutes of training that included training on sexual harassment required and provided by Taylor County Jail.  (Dec. of Bernas, ¶ 4; Dec. of Woebbeking, ¶ 79, Ex. H.)

31.     On May 28, 2018, Officer Bernas completed three hours of PREA-related training required and provided by Taylor County Jail. (Dec. of Bernas, ¶ 5; Dec. of Woebbeking, ¶ 79, Ex. H.)

32.     On April 25, 2017, Officer Scoles completed two hours of training regarding PREA and inmate manipulation that was required and provided by Taylor County Jail. (Dec. of Scoles, ¶ 5; Dec. of Woebbeking, ¶ 78, Ex. G.)

33.     On April 6, 2018, Officer Scoles completed 90 minutes of training that included training on sexual harassment required and provided by Taylor County Jail.  (Dec. of Scoles, ¶ 6; Dec. of Woebbeking, ¶ 78, Ex. G.)

34.     On May 23, 2018, Officer Scoles completed three hours of PREA-related training required and provided by Taylor County Jail. (Dec. of Scoles, ¶ 7; Dec. of Woebbeking, ¶ 78, Ex. G.)

35.     On April 24, 2017, Defendant Cheever completed two hours of training regarding PREA and inmate manipulation that was required and provided by Taylor County Jail. (Dec. of Woebbeking, ¶ 77, Ex. F.)

36.     On April 2, 2018, Defendant Cheever completed 90 minutes of training that included training on sexual harassment required and provided by Taylor County Jail. (Dec. of Woebbeking, ¶ 77, Ex. F.)

37.     On May 23, 2018, Defendant Cheever completed three hours of PREA-related training that was required and provided by Taylor County Jail. (Dec. of Woebbeking, ¶ 77, Ex. F.)

## OFFICER SACKMAN

38.     Rhonda Sackman was hired as a corrections officer by Taylor County on May 7, 2018. (Dec. of Sackman, ¶ 2.)

39.     From May 7, 2018 through September 20, 2018, Officer Sackman usually worked either the afternoon shift at TCJ from 2:00 p.m. to 10:30 p.m., or the night shift at TCJ from 10:00 p.m. to 6:30 a.m. (Dec. of Sackman, ¶ 25.)

40.     One of Officer Sackman's field training officers was Bailee Cheever. (Dec. of Sackman, ¶ 6.)

41.     During Officer Sackman's field training, Defendant Cheever specifically warned Officer Sackman against fraternization. Defendant Cheever told Officer Sackman to avoid certain actions that might be misinterpreted by inmates as being indications of friendship or interest in them personally. (Dec. of Sackman, ¶ 9.)

42.     During Officer Sackman's field training, Defendant Cheever told Officer Sackman not to dress up too much or look too "made-up" while on duty. Defendant Cheever told Officer Sackman that as female corrections officers, they were not there to impress anyone and their job was to maintain the safety and security of the jail. (Dec. of Sackman, ¶ 10.)

43.     During Officer Sackman's field training, Defendant Cheever also told Officer Sackman that it was important to let inmates talk and vent a little so that they feel respected and heard. Officer Sackman personally witnessed Defendant Cheever speaking at length with many inmates in this manner while Officer Sackman was shadowing Defendant Cheever. (Dec. of Sackman, ¶ 11.)

44.     Officer Sackman felt Defendant Cheever's approach allowing inmates to talk and vent was very effective in the right circumstances or situation. (Dec. of Sackman, ¶ 11.)

45.     Based on conversations during Officer Sackman's field training, it was Officer Sackman's understanding that Defendant Cheever had the philosophy of allowing inmates to talk and vent because it can help avoid grievances and disputes and it

generally helps facilitate the safety and security of the jail and its inmates. (Dec. of Sackman, ¶ 12.)

46.    By about early September of 2018, Officer Sackman began to notice that Defendant Cheever and Mr. Noeldner occasionally engaged in longer and more frequent conversations on the intercom than most other inmates who called into the pod on the intercom. (Dec. of Sackman, ¶ 28.)

47.    By early September of 2018, Mr. Noeldner appeared to be focusing his attention specifically on Defendant Cheever when he called to the control pod on the intercom. (Dec. of Sackman, ¶ 29.)

48.    In early September of 2018, Officer Sackman overheard discussions between Mr. Noeldner and Defendant Cheever about things like recent Packers games and Defendant Cheever's weekend plans. (Dec. of Sackman, ¶ 30.)

49.    Although the topics of conversation that Officer Sackman overheard between Mr. Noeldner and Defendant Cheever were not totally unusual, Officer Sackman felt the conversations seemed casual and seemed to happen too frequently. (Dec. of Sackman, ¶ 31.)

50.    Officer Sackman never heard anything spoken between Mr. Noeldner and Defendant Cheever that was at all sexual or flirtatious in nature at any time. (Dec. of Sackman, ¶ 32.)

51.    Officer Sackman never saw anything sexual or flirtatious in nature occur between Mr. Noeldner and Defendant Cheever at any time. (Dec. of Sackman, ¶ 33.)

52.     Officer Sackman never saw any physical contact between Defendant Cheever and Mr. Noeldner other than that which is normal and expected as incidental to incarceration—such as minor contact while securing an inmate in restraints or while escorting an inmate through the facility. (Dec. of Sackman, ¶ 34.)

53.     By approximately early September of 2018, Officer Sackman began to grow somewhat concerned about the informality and frequency of Mr. Noeldner's conversations with Defendant Cheever.  (Dec. of Sackman, ¶ 35.)

54.     Officer Sackman felt that the tone and frequency of the conversations she overheard between Mr. Noeldner and Defendant Cheever did not seem to rise to the level of any kind of misconduct, but they did make Officer Sackman somewhat uneasy. (Dec. of Sackman, ¶ 36.)

55.     In early September of 2018, Officer Sackman approached Officer Scoles and mentioned the conversations between Mr. Noeldner and Defendant Cheever to see what he thought.  (Dec. of Scoles, ¶ 28; Dec. of Sackman, ¶ 37.)

56.     Officer Sackman did not want to jump to any conclusions about what the conversations she overheard between Mr. Noeldner and Defendant Cheever might or might not mean. (Dec. of Sackman, ¶ 38.)

57.     When Officer Sackman spoke with Officer Scoles in early September of 2018, Officer Sackman told Officer Scoles that Mr. Noeldner appeared to be overly friendly with Defendant Cheever and Officer Sackman recounted some of her observations. (Dec. of Scoles, ¶ 29; Dec. of Sackman, ¶ 39.)

58.     After Officer Sackman relayed her observations to Officer Scoles, Officer Scoles agreed that Defendant Cheever's conversations with Mr. Noeldner seemed unprofessional. (Dec. of Scoles, ¶ 31; Dec. of Sackman, ¶ 41.)

59.     Officer Scoles indicated to Officer Sackman that he did not want to make any presumptions about Defendant Cheever given the minimal amount and subjective and speculative nature of information, along with the fact that he had not personally witnessed any of it. (Dec. of Scoles, ¶ 32; Dec. of Sackman, ¶ 41.)

60.     At the conclusion of Officer Sackman's and Officer Scoles's conversation, Officer Scoles told Officer Sackman that she should be the one to inform a sergeant about Defendant Cheever's conversations if Officer Sackman felt it was warranted. (Dec. of Scoles, ¶ 33; Dec. of Sackman, ¶ 42.)

61.     After speaking with Officer Scoles, Officer Sackman decided to keep her eye out for instances of conduct between Mr. Noeldner and Defendant Cheever that might suggest that Officer Sackman should report things to her supervisors. (Dec. of Sackman, ¶ 43.)

62.     In approximately mid-September of 2018, Officer Sackman began noticing that Defendant Cheever had started to dress nicely and wear makeup when she had not done so before. (Dec. of Sackman, ¶ 44.)

63.     In approximately mid-September of 2018, Officer Sackman began noticing that Defendant Cheever had started to watch the camera feeds from Mr. Noeldner's cell block frequently. (Dec. of Sackman, ¶ 45.)

64.     In approximately mid-September of 2018, Officer Sackman noticed what she thought could be suspicious "looks" between Defendant Cheever and Mr. Noeldner. (Dec. of Sackman, ¶ 46.)

65.     By approximately mid-September of 2018, Officer Sackman had an uncomfortable feeling about Defendant Cheever and Mr. Noeldner that she could not shake. (Dec. of Sackman, ¶ 47.)

66.     On September 17, 2018, Officer Sackman was working the same shift as Officer Scoles and she mentioned to Officer Scoles that she noticed Defendant Cheever had begun to dress nicely and was wearing makeup when she had not done so before. (Dec. of Scoles, ¶ 40; Dec. of Sackman, ¶ 48.)

67.     On September 17, 2018, Officer Sackman told Officer Scoles that she had also noticed that Defendant Cheever had begun watching the camera feeds from Mr. Noeldner's cell block frequently. (Dec. of Scoles, ¶ 41; Dec. of Sackman, ¶ 49.)

68.     On September 17, 2018, Officer Sackman told Officer Scoles that she had seen what could be suspicious "looks" between Defendant Cheever and Mr. Noeldner and that she had an uncomfortable feeling around them that she could not shake. (Dec. of Scoles, ¶ 42; Dec. of Sackman, ¶ 50.)

69.     On September 17, 2018, Officer Sackman told Officer Scoles that she had not seen anything sexual or flirtatious happen between Defendant Cheever and Mr. Noeldner. (Dec. of Scoles, ¶ 30; Dec. of Sackman, ¶ 50.)

70.     As of September 17, 2018, Officer Sackman was not sure if she was just reading into things or jumping to conclusions. Officer Sackman did not want to accuse

Defendant Cheever of doing something wrong if it was just Officer Sackman's imagination getting carried away.  (Dec. of Sackman, ¶ 51.)

71.    As of September 17, 2018, Officer Sackman discussed her concerns with Officer Scoles because she wanted to make sure she knew how to approach her concerns if she did see or hear anything happen between Defendant Cheever and Mr. Noeldner that should be reported. (Dec. of Sackman, ¶ 52.)

72.    Officer Scoles told Officer Sackman that Officer Bernas had noticed that Defendant Cheever was taking longer and more frequent trips to the medication room with Mr. Noeldner.  (Dec. of Sackman, ¶ 53.)

73.    Based on what Officer Sackman told Officer Scoles, Officer Scoles was not sure if Officer Sackman was just reading into things or jumping to conclusions. Officer Scoles did not want to make unfounded accusations against anyone. But Officer Scoles also felt that if objective evidence existed to corroborate Officer Sackman's concerns, the situation should be brought to the attention of a supervisor. (Dec. of Scoles, ¶ 43.)

74.    Based on Officer Sackman's concerns and what Officer Bernas had reported to Officer Scoles, Officer Scoles and Officer Sackman decided to randomly check camera footage to see if there was any objective evidence of overly long intercom conversations or overly long trips by Defendant Cheever and Mr. Noeldner to the medication room. (Dec. of Scoles, ¶ 44; Dec. of Sackman, ¶ 54.)

75.    Officer Scoles felt that if there was video evidence supporting what Officer Bernas and/or Officer Sackman were seeing, the situation would rise to the level of reportable potential misconduct. (Dec. of Scoles, ¶ 45.)

76.     Upon reviewing the surveillance footage on September 17, 2018 from several recent, random dates, Officer Scoles and Officer Sackman were able to confirm that Defendant Cheever had recently made frequent and lengthy visits to the medication room where she would meet Mr. Noeldner and move out of view of the camera, and she and Mr. Noeldner had engaged in multiple lengthy intercom conversations. (Dec. of Scoles, ¶ 46; Dec. of Sackman, ¶ 55.)

77.     Based on what Officer Scoles and Officer Sackman saw in the surveillance videos, along with what Officer Sackman and Officer Bernas had reported observing, Officer Scoles and Officer Sackman decided that the only proper course of action was to promptly bring the issue to the attention of their superiors for further investigation if they deemed it necessary. (Dec. of Scoles, ¶ 47; Dec. of Sackman, ¶ 56.)

78.     Officer Scoles told Officer Sackman that he would communicate her concerns and what they found on the surveillance footage to their supervisors. (Dec. of Scoles, ¶ 48; Dec. of Sackman, ¶ 57.)

79.     Officer Sackman had absolutely no idea that Defendant Cheever and Mr. Noeldner were engaged in any kind of sexual contact or sexual relationship until jail administrators notified Officer Sackman of Defendant Cheever's resignation and of the ensuing investigation. (Dec. of Sackman, ¶ 58.)

**OFFICER BERNAS**

80.     Officer Bernas was employed by Taylor County as a corrections officer at TCJ from April 21, 2017 to March 5, 2021. (Dec. of Bernas, ¶ 2.)

81.     April 26, 2018 through September 20, 2018, Officer Bernas worked all shifts at TCJ, but he worked the night shift at TCJ from 10:00 p.m. to 6:30 a.m. the most. (Dec. of Bernas, ¶ 24.)

82.     One of Officer Bernas's field training officers was Bailee Cheever. (Dec. of Bernas, ¶ 7.)

83.     During his employment as a TCJ corrections officer, Officer Bernas never had any problems with Defendant Cheever and she seemed to Officer Bernas like a good corrections officer who was effective and respected. (Dec. of Bernas, ¶ 8.)

84.      During his employment as a TCJ corrections officer, Officer Bernas was not aware of any concerns or complaints about Defendant Cheever's conduct or professionalism and was unaware of any disciplinary issues involving Defendant Cheever. (Dec. of Bernas, ¶ 9.)

85.     Officer Bernas never heard anything spoken between Mr. Noeldner and Defendant Cheever that was at all sexual or flirtatious in nature at any time. (Dec. of Bernas, ¶ 29.)

86.     Officer Bernas never saw anything sexual or flirtatious in nature occur between Mr. Noeldner and Defendant Cheever at any time. (Dec. of Bernas, ¶ 30.)

87.     Officer Bernas never saw any physical contact between Defendant Cheever and Mr. Noeldner other than that which is normal and expected as incidental to incarceration—such as minor contact while securing an inmate in restraints or while escorting an inmate through the facility. (Dec. of Bernas, ¶ 31.)

88.    Officer Bernas never saw or heard anything occur between Mr. Noeldner and Defendant Cheever that would rise to the level of misconduct. (Dec. of Bernas, ¶ 32.)

89.    During Officer Bernas's field training, Defendant Cheever told Officer Bernas that it was important to let inmates talk and vent a little so that they feel respected and heard. (Dec. of Bernas, ¶ 12.)

90.    Officer Bernas personally witnessed Defendant Cheever speaking at length with many inmates in this manner while he was shadowing her during field training, and Officer Bernas felt it was very effective in the right circumstances or situation. Dec. of Bernas, ¶ 12.)

91.    Based on their conversations during Officer Bernas's field training, it was Officer Bernas's understanding that Defendant Cheever had the philosophy of allowing inmates to talk and vent because it can help avoid grievances and disputes and it generally helps facilitate the safety and security of the jail and its inmates. (Dec. of Bernas, ¶ 13.)

92.    In mid-September of 2018, Officer Bernas began to notice that Mr. Noeldner seemed to be paying more attention to Defendant Cheever than any other pod officers working the night shift. Mr. Noeldner would call the control pod on the intercom more often when Defendant Cheever was working, he seemed to take on a very friendly and casual tone with Defendant Cheever, and Mr. Noeldner would ask Defendant Cheever to get him Tylenol from the medication room more frequently than he would ask other officers on duty. (Dec. of Bernas, ¶ 33.)

93.    Officer Bernas saw and heard Mr. Noeldner ask for Tylenol from other pod officers at times, and Officer Bernas obtained Tylenol for Mr. Noeldner at times. (Dec. of Bernas, ¶ 34.)

94.    Based on his observations, it appeared to Officer Bernas that Mr. Noeldner was instigating contact with Defendant Cheever and Officer Bernas became suspicious that Mr. Noeldner might be trying to manipulate Defendant Cheever to get favors like extra food, better housing assignments, or more freedoms and privileges. (Dec. of Bernas, ¶ 35.)

95.    Officer Bernas knew from his training that inmates may try to manipulate corrections officers for any number of reasons, including to get favors, to pass contraband, for sexual gratification, to assert power or control, and even out of boredom for entertainment. (Dec. of Bernas, ¶ 36.)

96.    As of mid-September of 2018, it was Officer Bernas's opinion that Defendant Cheever was a very good employee who often spoke to many inmates at length in a caring but professional manner about all sorts of issues. The fact that Defendant Cheever had lengthy conversations with any given inmate was not unprecedented or unusual. (Dec. of Bernas, ¶ 37.)

97.    Officer Bernas observed an incident in which Defendant Cheever sat with a female inmate who was having a panic attack for over an hour, calmly talking the inmate through it. (Dec. of Bernas, ¶ 38.)

98.    In Officer Bernas's opinion, Defendant Cheever's approach not only displayed kindness and respect for the inmate, it also helped the jail run smoothly. Because

Defendant Cheever was able to keep the inmate calm, officers did not have to page medical staff or transport the inmate to the hospital. (Dec. of Bernas, ¶ 39.)

99.    In Officer Bernas's opinion, Defendant Cheever treated inmates with dignity and seemed to believe that spending some time listening to them and their complaints could help ensure smooth operations of the jail in the long run. (Dec. of Bernas, ¶ 40.)

100.    Officer Bernas worried that Defendant Cheever's approach of openness and kindness towards inmates, even though entirely professional, could make her a target for certain inmates who might try to manipulate her. (Dec. of Bernas, ¶ 41.)

101.    Officer Bernas worried that longer trips to the medication room with an inmate could jeopardize Defendant Cheever's safety. (Dec. of Bernas, ¶ 42.)

102.    Despite Officer Bernas's concerns about the potential for manipulation, based on his observations, Officer Bernas never suspected or worried that Mr. Noeldner and Defendant Cheever were engaged in any kind of sexual or romantic contact or that Mr. Noeldner was trying to manipulate Defendant Cheever for sexual gratification (or vice versa). (Dec. of Bernas, ¶ 43.)

103.    In mid-September of 2018, Officer Bernas approached Officer Jason Ray, who often worked with Defendant Cheever on the night shift, because Officer Bernas thought maybe Mr. Noeldner had a medical condition that required frequent use of Tylenol. Officer Bernas asked Officer Ray about Mr. Noeldner requesting medication during the night shift. Officer Bernas said that when he worked on the day shift, Mr. Noeldner rarely asked for medication. (Dec. of Bernas, ¶ 44.)

104.    Officer Ray told Officer Bernas that Mr. Noeldner did frequently request Tylenol on the night shift and that Defendant Cheever usually volunteered to get it from the medication room. Officer Ray also told Officer Bernas that Defendant Cheever's trips to the medication room seemed to take a long time. (Dec. of Bernas, ¶ 45.)

105.    Officer Bernas never saw or heard any contact between Defendant Cheever and Mr. Noeldner in which it appeared that Mr. Noeldner was in fact manipulating Defendant Cheever. (Dec. of Bernas, ¶ 46.)

106.    Officer Bernas believed the potential for Mr. Noeldner to manipulate Defendant Cheever existed.   (Dec. of Bernas, ¶ 46.)

107.    In mid-September of 2018, Officer Bernas approached Officer Scoles and told him that he thought Mr. Noeldner might be manipulating Defendant Cheever. (Dec. of Scoles, ¶ 34; Dec. of Bernas, ¶ 47.)

108.    Officer Bernas told Officer Scoles that he believed Defendant Cheever's trips to the medication room with Mr. Noeldner were taking longer than necessary. Officer Bernas also told Officer Scoles that Mr. Noeldner seemed to be focusing his attention on Defendant Cheever. (Dec. of Scoles, ¶ 35; Dec. of Bernas, ¶ 48.)

109.    Officer Bernas told Officer Scoles that he had not seen anything occur between Mr. Noeldner and Defendant Cheever that would rise to the level of misconduct, and he told this to Officer Scoles. (Dec. of Scoles, ¶ 36; Dec. of Bernas, ¶ 49.)

110.    Officer Bernas told Officer Scoles that Defendant Cheever's long trips to the medication room made him uneasy about Defendant Cheever's safety and Officer

Bernas asked Officer Scoles for advice on how to handle what he was seeing. (Dec. of Scoles, ¶ 37; Dec. of Bernas, ¶ 50.)

111.     Officer Scoles listened to Officer Bernas and agreed that if Defendant Cheever was taking long trips to the medication room with an inmate, that seemed unprofessional and could also jeopardize her safety. (Dec. of Scoles, ¶ 38-39; Dec. of Bernas, ¶ 51.)

112.     A day or two later, on September 18, 2018, Officer Bernas was working third shift at TCJ with Defendant Cheever. Officer Bernas approached Defendant Cheever and told her that he had noticed Mr. Noeldner calling the control pod more often when she was working. (Dec. of Bernas, ¶ 52.)

113.     Officer Bernas told Defendant Cheever that he thought it was taking longer than it should for her to get Tylenol for Mr. Noeldner from the medication room. (Dec. of Bernas, ¶ 53.)

114.     Officer Bernas told Defendant Cheever that it could just be coincidental, but Officer Bernas was concerned about the potential for manipulation and for Defendant Cheever's safety while she was in the medication room. (Dec. of Bernas, ¶ 54.)

115.     Officer Bernas asked Defendant Cheever to make Mr. Noeldner stand in the hall where he would be visible on the surveillance cameras when getting Tylenol for him from the medication room. (Dec. of Bernas, ¶ 55.)

116.     Defendant Cheever agreed to make Mr. Noeldner stand within view of the surveillance camera. (Dec. of Bernas, ¶ 56.)

117.    Defendant Cheever told Officer Bernas that the trips to the medication room were taking a little longer because Mr. Noeldner was feeling depressed and had told her that it helped talking through things with her. (Dec. of Bernas, ¶ 57.)

118.    Officer Bernas had absolutely no idea that Defendant Cheever and Mr. Noeldner were engaged in any kind of sexual contact or sexual relationship until jail administrators notified Officer Bernas of her resignation and of the ensuing investigation. (Dec. of Bernas, ¶ 58.)

## OFFICER SCOLES

119.    Officer Scoles was employed by Taylor County as a corrections officer at TCJ from June 26, 2015 through November, 2018. (Dec. of Scoles, ¶ 2-3.)

120.    April 26, 2018 through September 20, 2018, Officer Scoles worked the afternoon shift from 2:00 p.m. to 10:30 p.m. Officer Scoles did not work the night shift. (Dec. of Scoles, ¶ 8.)

121.    Officer Scoles did not work with Defendant Cheever. At most, Officer Scoles and Defendant Cheever would see each other for maybe 30 minutes at the end of Officer Scoles's shift as Defendant Cheever's shift began. (Dec. of Scoles, ¶ 9.)

122.    Officer Scoles never had any problems with Defendant Cheever and she seemed to him like a good corrections officer who was effective and respected. (Dec. of Scoles, ¶ 9.)

123.    Officer Scoles was not aware of any concerns or complaints about Defendant Cheever's conduct or professionalism and was unaware of any disciplinary issues involving Defendant Cheever. (Dec. of Scoles, ¶ 10.)

124.   Officer Scoles never observed or overheard any interaction of any kind between Defendant Cheever and Mr. Noeldner. (Dec. of Scoles, ¶ 25.)

125.   Officer Scoles never observed or overheard Mr. Noeldner speaking about Defendant Cheever. (Dec. of Scoles, ¶ 26.)

126.   Officer Scoles never observed or overheard Defendant Cheever speaking about Mr. Noeldner. (Dec. of Scoles, ¶ 27.)

127.   On September 18, 2018 at 8:06 p.m., Officer Scoles sent an email to jail administrators about the observations and concerns raised by Officers Sackman and Bernas and Officer Scoles's observations of the surveillance footage. Officer Scoles identified the specific camera footage that he and Officer Sackman had reviewed showing intercom conversations between Defendant Cheever and Plaintiff of 45 minutes, 20 minutes, 16 minutes, 13 minutes, 20 minutes, and 33 minutes. It also showed two trips to the medication room that took 9 minutes each. (Dec. of Scoles, ¶ 49; Dec. of Woebbeking, ¶ 54, Ex. B.)

## ADMINISTRATORS

128.   Chief Deputy, Larry Woebbeking (now Sheriff) responded to Officer Scoles's September 18, 2018 email at 8:34 p.m. He thanked Officer Scoles for informing them of their concerns, confirmed it was the appropriate thing to do, advised that they would be looking into the concerns further, and asked Officer Scoles to keep the matter confidential. (Dec. of Woebbeking, ¶ 54.)

129.     Sheriff Bruce Daniels responded separately to Chief Deputy Woebbeking by email at 9:18 p.m. on September 18, 2018 and stated that they would meet in the morning to determine their next steps. (Dec. of Woebbeking, ¶ 55.)

130.     On the morning of September 19, 2018, Sergeant Angie Becker, Sheriff Daniels, and Chief Deputy Woebbeking met to discuss Officer Scoles's email. (Dec. of Woebbeking, ¶ 56.)

131.     Chief Deputy Woebbeking directed Sergeant Becker to search text messages sent to and received by Mr. Noeldner to see if she could gather any relevant information for their investigation, such as references to Defendant Cheever, medications, or any indications that Mr. Noeldner may be trying to manipulate Defendant Cheever or vice versa. (Dec. of Woebbeking, ¶ 57.)

132.     Sergeant Becker reported back to Chief Deputy Woebbeking that she noticed a significant number of text messages beginning on August 15, 2018 between Mr. Noeldner and a person with a name and phone number that was not Defendant Cheever's name or number. (Dec. of Woebbeking, ¶ 60.)

133.     Sergeant Becker told Chief Deputy Woebbeking that based on the context of the texts, which were romantic and/or sexual in nature, Sergeant Becker suspected that the text messages could be from Defendant Cheever even though the sender was identified by multiple different names and phone numbers—none of which were Bailee Cheever. (Dec. of Woebbeking, ¶ 61.)

134.     Sergeant Becker provided Chief Deputy Woebbeking with information from control pod footage that she had reviewed from times while Defendant Cheever was

working. Sergeant Becker noted that when Mr. Noeldner and Defendant Cheever were talking on the intercom, Defendant Cheever ended the conversations when other officers walked down the hall nearby. Defendant Cheever would then resume the intercom conversations once the officers were no longer in the hall. (Dec. of Woebbeking, ¶ 62.)

135.    By 11:30 a.m. on September 19, 2018, Sheriff Daniels and Chief Deputy Woebbeking met with Taylor County's Human Resources Director to advise her of the situation.  (Dec. of Woebbeking, ¶ 58.)

136.    Chief Deputy Woebbeking called Defendant Cheever on September 19, 2018 and they arranged to meet at 8:00 p.m. –within 24 hours of administration being notified of the officers' concerns. (Dec. of Woebbeking, ¶ 59.)

137.    After calling Defendant Cheever, Chief Deputy Woebbeking called Taylor County's corporation counsel and informed her of the text messages identified by Sergeant Becker suggesting that sexual contact may have occurred at the jail between Defendant Cheever and Mr. Noeldner. In light of this information, corporation counsel advised Chief Deputy Woebbeking not to proceed with an internal investigation. Rather, they should contact an outside agency to conduct an investigation. (Dec. of Woebbeking, ¶ 63.)

138.    On September 19, 2018, Chief Deputy Woebbeking contacted Marathon County Sheriff's Office and requested their assistance, which they agreed to provide. (Dec. of Woebbeking, ¶ 64.)

139.    Chief Deputy Woebbeking met with Defendant Cheever as planned at 8:00 p.m. on September 19, 2018 at the Sheriff's Office. (Dec. of Woebbeking, ¶ 65.)

140.    Chief Deputy Woebbeking gave Defendant Cheever a letter signed by Sheriff Daniels stating that she was relieved of duty with pay pending the completion of an investigation into allegations that she had engaged in misconduct involving inappropriate contact with an inmate.  (Dec. of Woebbeking, ¶ 66.)

141.    Chief Deputy Woebbeking told Defendant Cheever that the Marathon County Sheriff's Office would be conducting the investigation and someone would likely be in contact with her. (Dec. of Woebbeking, ¶ 67.)

142.    On September 20, 2018, Defendant Cheever submitted a handwritten note to Taylor County stating that she was resigning. (Dec. of Woebbeking, ¶ 68.)

143.    Prior to this incident with Bailee Cheever, the Taylor County Jail has never had an incident in which a corrections officer engaged in sexual contact or communication with an inmate or was accused of doing so. (Dec. of Woebbeking, ¶ 69.)

144.    Prior to this 2018 incident, Defendant Cheever had never been suspected of, accused of, or disciplined for any kind of inappropriate contact or conduct with inmates. (Dec. of Woebbeking, ¶ 70.)

145.    During her employment with Taylor County, Defendant Cheever was never suspected of, accused of, or disciplined for any kind of sexually inappropriate contact, conduct, or harassment with or toward other jail staff. (Dec. of Woebbeking, ¶ 71.)

146.    Going back at least as far as February, 2007 when Chief Deputy Woebbeking started as Chief Deputy at TCJ, and other than the 2018 incident with Defendant

Cheever, no correctional officer employed at the Taylor County Jail has ever been accused of, investigated for, or disciplined as a result of engaging in sexual contact or conduct with inmates. Sheriff Woebbeking is not aware of any past instances of such accusations, investigations, or discipline at TCJ. (Dec. of Woebbeking, ¶ 2, 72.)

147.    Going back at least as far as February, 2007 when Chief Deputy Woebbeking started as Chief Deputy at TCJ, no correctional officer employed at the Taylor County Jail has ever been accused of, investigated for, or disciplined as a result of engaging in any kind of sexually inappropriate contact, conduct, or harassment with or toward other jail staff. Sheriff Woebbeking is not aware of any past instances of such accusations, investigations, or discipline at TCJ. (Dec. of Woebbeking, ¶ 2, 73.)

148.    Going back at least as far as February, 2007 when Chief Deputy Woebbeking started as Chief Deputy at TCJ, no inmate has ever filed a grievance or otherwise complained about an insufficient reporting system for instances of sexual assault or abuse. Sheriff Woebbeking is not aware of any difficulties or concerns related to TCJ's inmate reporting system. (Dec. of Woebbeking, ¶ 2, 74.)

## INMATE RULES

149.    TCJ's inmate rules are provided in list format. There are 32 enumerated rules, including "zero tolerance for sexual abuse/misconduct." (Dec. of Woebbeking, ¶ 32.)

150.    All inmates receive a copy of TCJ's inmate rules when booked into the jail. The booking officer also verbally reviews the rules and regulations with each inmate during the booking process, including the jail's zero tolerance policy. (Dec. of Woebbeking, ¶ 33.)

151.    During the relevant time period, "Zero Tolerance" posters printed in English, Spanish, and Hmong were posted in multiple locations, including inmate living areas, throughout the jail. (Dec. of Woebbeking, ¶ 34.)

152.    TCJ's inmate rules state that inmates "may report sexual misconduct/abuse verbally to any staff member, in writing to any staff member, may report anonymously." (Dec. of Woebbeking, ¶ 35.)

153.    During the relevant time, TCJ had in place a program for inmates to use jail-issued iPads to send and receive text messages. (Dec. of Woebbeking, ¶ 36, Ex. K.)

154.    TCJ inmates participating in the iPad program are made aware that all text messages sent and received are recorded and subject to review by jail officials. (Dec. of Woebbeking, ¶ 37.)

155.    A TCJ inmate participating in the iPad program receives a jail-issued device with a dedicated phone number. (Dec. of Woebbeking, ¶ 38.)

156.    TCJ inmates participating in the iPad program may not use the device to contact or communicate with other inmates, victims, witnesses, or anyone with a court-issued no-contact order. (Dec. of Woebbeking, ¶ 39.)

157.    Correctional officers are directed to routinely review inmate text messages as time permits to identify any inappropriate or illegal messages or conduct for the safety and security of the jail. (Dec. of Woebbeking, ¶ 40.)

158.    Inmate text messages are not considered inappropriate or illegal simply because they are sexual in tone or topic. Rather, text messages may be considered inappropriate if they involve threats or harassment; attempts to violate probation, court orders, or the

law; attempts to coordinate the sending or receipt of contraband; or if they provide information that could jeopardize the safety and security of the jail.   (Dec. of Woebbeking, ¶ 41.)

159.    When reviewing inmate text messages, TCJ corrections officers are able to see whether the message was incoming or outgoing; the date and time the message was sent or received; the participating inmate's name; the participating inmate's designated texting phone number; the status of the text (whether it was sent or if it was rejected by the outside recipient); the outside party's phone number; the outside party's name as designated by the inmate; and the content of the text. (Dec. of Woebbeking, ¶ 42.)

160.    A TCJ inmate participating in the iPad program is able to enter into his device a name for each contact that is associated with the numbers to which he sends and from which he receives text messages. For example, an inmate may designate a specific phone number as belonging to "mom" even if the number does not actually belong to the inmate's mother.  (Dec. of Woebbeking, ¶ 43.)

161.    There are 49 surveillance cameras located throughout TCJ. The jail has a "POD" configuration wherein it monitors all the cameras throughout the jail from the control pod 24 hours a day, 7 days a week. Any jail staff member can review the camera footage at any time, and any other officer on duty can view the camera feeds in real-time from the control pod. (Dec. of Woebbeking, ¶ 44.)

162.    The control pod is considered the "nerve center" of the facility. The officer assigned to the control pod must monitor not only the camera systems but also all doors, alarms, phones, and intercoms. (Dec. of Woebbeking, ¶ 45.)

163.    The control pod officer must visually observe all inmates and must also monitor all officers while they are in contact with inmates. In addition to monitoring multiple systems, the control pod officer must also maintain all applicable logs and documentation. (Dec. of Woebbeking, ¶ 46.)

164.    Although the assigned control pod officer is required to observe all inmates via the camera systems, the officer cannot watch all inmates simultaneously and is not expected to do so. (Dec. of Woebbeking, ¶ 47.)

165.    The control pod is never left unattended. (Dec. of Woebbeking, ¶ 48.)

166.    Only one officer needs to be in the control pod at a time. The other officers on duty may be completing rounds, responding to inmate requests, or walking the floor. (Dec. of Woebbeking, ¶ 49.)

167.    TCJ has an intercom system wherein each pod has a phone that, when picked up by an inmate, rings to the control pod. The intercom system only allows an inmate to communicate directly with the guard assigned to the control pod and vice versa. It cannot be used to communicate with any other officers unless they are in the control pod. (Dec. of Woebbeking, ¶ 50.)

168.    While use of the intercom system is supposed to be limited to true emergencies, inmates frequently use the phone to contact the control pod about relatively mundane issues, including questions about the date of their next court hearing, asking if they have a visitor, asking for more toilet paper, etc. (Dec. of Woebbeking, ¶ 51.)

169.    It is not unusual for inmates to use the intercom system to call the control pod at all hours of the day to discuss or request any number of things. (Dec. of Scoles, ¶ 24;

Dec. of Bernas, ¶ 26; Dec. of Sackman, ¶ 27; Dkt. No. 44, ¶ 20; Dec. of Woebbeking, ¶ 52.)

170.    At the relevant time period, TCJ did not have any kind of video communication system for use by inmates. A video communication system was not implemented until February 20, 2021. (Dec. of Woebbeking, ¶ 53.)

<u>**DEFENDANT CHEEVER**</u>

171.    During the first several months of Mr. Noeldner's incarceration, he often spoke with Defendant Cheever about his cases, things that were stressing him out, and problems he was having. He would speak to Defendant Cheever as she passed by for rounds, and he would also speak to Defendant Cheever by calling her on the jail intercom when Defendant Cheever was working in the control pod. (Dkt. No. 44, ¶ 18; Dkt. No. 41, p. 29.)

172.    When Mr. Noeldner spoke with Defendant Cheever about his cases, his stresses, or his problems, Defendant Cheever generally listened to him and tried to provide feedback or guidance where appropriate. (Dkt. No. 44, ¶ 19.)

173.    Inmates often called the control pod via the intercom to talk to correctional officers at all hours. Therefore, the fact that Mr. Noeldner called to talk to her during the night shift did not strike Defendant Cheever as particularly unusual. (Dkt. No. 44, ¶ 20.)

174.    Defendant Cheever believed that listening to inmate complaints and letting inmates vent is all part of the job of being a corrections officer, because it helps alleviate stress and tension in housing blocks and generally encourages inmates to be cooperative with staff. (Dkt. No. 44, ¶ 21.)

175.    By about August of 2018, Mr. Noeldner began calling Defendant Cheever more frequently on the intercom and was becoming more friendly in his tone and topics of conversation. (Dkt. No. 44, ¶ 25.)

176.    Defendant Cheever escorted Mr. Noeldner to the TCJ medication room to retrieve over-the-counter medications he was requesting. By around August of 2018, Mr. Noeldner was becoming more friendly and flirtatious with Defendant Cheever during these short trips. (Dkt. No. 44, ¶ 22-24.)

177.    By approximately the middle of August, 2018, Mr. Noeldner passed Defendant Cheever a romantic letter when she came to his cell block to retrieve the unit's request sheet for the day. (Dkt. No. 44, ¶ 26; Dkt. No. 41, p. 24-26.)

178.    Mr. Noeldner handed Defendant Cheever the request sheet. She then discovered that he had concealed a letter to her that he had placed underneath the request sheet so that it was hidden from view of the surveillance cameras. (Dkt. No. 44, ¶ 26; Dkt. No. 41, p. 26.)

179.    On August 15, 2018, Defendant Cheever began sending Mr. Noeldner text messages to his jail-issued iPad.  (Dkt. No. 44, ¶ 27.)

180.    Defendant Cheever knew that TCJ inmate text messages were routinely monitored and reviewed by corrections officers. (Dkt. No. 44, ¶ 28.)

181.    Defendant Cheever knew that if anyone discovered that she was texting with Mr. Noeldner, she would be disciplined. (Dkt. No. 44, ¶ 29.)

182.    Defendant Cheever proactively took multiple steps to try to ensure that no one learned about her text messages with Mr. Noeldner.  (Dkt. No. 44, ¶ 30.)

183.    Defendant Cheever told Mr. Noeldner not to refer to her as "Bailee" in their text conversations because their texts were monitored by other corrections officers, and they never used her real name. (Dkt. No. 41, p. 23.)

184.    Mr. Noeldner eventually asked Defendant Cheever to put money on his iPad texting account so that they could continue texting, because each text message costs the inmate $0.09 and they were going through $20.00 per day in text messages. (Dkt. No. 44, ¶ 31; Dkt. No. 41, p. 34-35.)

185.    Defendant Cheever initially declined to put money on Mr. Noeldner's account for text messages because she had a joint bank account with her husband. She knew that the charge would show up on her bank account statements and she did not want her husband or anyone else to know that she was texting Mr. Noeldner. (Dkt. No. 44, ¶ 32.)

186.    When Defendant Cheever did eventually put money on Mr. Noeldner's account for text messages, she did so by using pre-paid debit cards. In this way, her bank account statement would not reflect how that money was being spent and this reduced the chances that anyone would find out. (Dkt. No. 44, ¶ 33.)

187.    Defendant Cheever did not text with Mr. Noeldner while she was working because she did not want any of her co-workers to see that she was texting someone in case they would inquire about the texts. (Dkt. No. 44, ¶ 34.)

188.    Defendant Cheever did not text with Mr. Noeldner when her husband was home because she did not want him inquiring about her text conversations and finding out about her relationship with Mr. Noeldner. (Dkt. No. 44, ¶ 35.)

189.   Defendant Cheever installed an application on her phone, called TextNow, to text with Mr. Noeldner. (Dkt. No. 44, ¶ 36.)

190.   The TextNow application sends the user's text messages from a randomly assigned phone number. Defendant Cheever used this application so that her personal cell phone number would not appear on any of Mr. Noeldner's text messages. (Dkt. No. 44, ¶ 37.)

191.   Texts sent using the TextNow application do not show up on the user's phone bill. (Dkt. No. 44, ¶ 38.)

192.   By approximately the end of August, 2018, Mr. Noeldner and Defendant Cheever had engaged in light flirtatious touching while they were in the medication room together. They had also kissed each other at least once in the medication room. (Dkt. No. 44, ¶ 39.)

193.   Defendant Cheever was aware and understood that kissing and even light flirtatious touching between corrections officers and inmates was prohibited. (Dkt. No. 44, ¶ 40.)

194.   Defendant Cheever knew that while she and Mr. Noeldner were in the medication room, they would not be visible on surveillance cameras. (Dkt. No. 44, ¶ 41-42.)

195.   Mr. Noeldner and Defendant Cheever discussed how and where to stand and moved the medication desk in the medication room so that they would not be seen on the surveillance cameras. (Dkt. No. 41, p. 146-147; Dkt. No. 44, ¶ 44.)

34

196.   The only location that Mr. Noeldner and Defendant Cheever had any kind of physical contact was in the medication room of TCJ. (Dkt. No. 44, ¶ 43.)

197.   By the beginning of September, 2018, Defendant Cheever's intercom conversations with Mr. Noeldner were becoming longer in duration and more frequent. (Dkt. No. 44, ¶ 45.)

198.   At times, other corrections officers were present in the control pod when Mr. Noeldner called to speak to Defendant Cheever or called to ask for medications. (Dkt. No. 44, ¶ 46.)

199.   Defendant Cheever never spoke about sexual topics with Mr. Noeldner on the jail intercom. (Dkt. No. 44, ¶ 47.)

200.   On September 10, 2018, Defendant Cheever and Mr. Noeldner had sexual intercourse in the medication room of TCJ.  (Dkt. No. 44, ¶ 48.)

201.   This was the only time Defendant Cheever and Mr. Noeldner ever had sexual intercourse. (Dkt. No. 44, ¶ 48.)

202.   At all relevant times, Defendant Cheever knew that having sexual intercourse with an inmate was wrong and was strictly prohibited. She knew that if anyone found out, she would be fired. (Dkt. No. 44, ¶ 49-50.)

203.   Based on her training and TCJ's policies, Defendant Cheever was aware that her sexual and physical contact with Mr. Noeldner was prohibited. (Dkt. No. 44, ¶ 61.)

204.   During the middle of September, 2018, Defendant Cheever and Mr. Noeldner continued having conversations over the jail's intercom system. Their conversations

over the intercom remained causal, but they never discussed anything sexual in nature. (Dkt. No. 44, ¶ 51.)

205.    Defendant Cheever is not aware of any other corrections officer overhearing any intercom conversation between Defendant Cheever and Mr. Noeldner. (Dkt. No. 44, ¶ 52.)

206.    By the middle of September, 2018, Defendant Cheever and Mr. Noeldner had engaged in sexual touching in the medication room when she was working during the night shift. (Dkt. No. 44, ¶ 53.)

207.    Each time Defendant Cheever and Mr. Noeldner had sexual contact, Defendant Cheever made sure that her uniform was in place and tidy when she left the medication room so that no one would have any reason to suspect that they had just engaged in sexual contact. (Dkt. No. 44, ¶ 55.)

208.    Defendant Cheever is not aware of any other corrections officer seeing any sexual contact between her and Mr. Noeldner anywhere in the Jail. (Dkt. No. 44, ¶ 54.)

209.    As of September 18, 2018, Defendant Cheever had no idea that anyone knew about or had any suspicions about the nature of her contacts with Mr. Noeldner. (Dkt. No. 44, ¶ 56.)

210.    Defendant Cheever never told anyone about her sexual contacts with Mr. Noeldner until she was interviewed by detectives from the Marathon County Sheriff's Office on September 20, 2018. (Dkt. No. 44, ¶ 60.)

211.    Defendant Cheever pled no contest to the one count of sexual assault in violation of Wis. Stat. § 940.225(3)(a). She was subsequently found guilty of that charge. (Dkt. No. 44, ¶ 65.)

## ADDITIONAL FACTS

212.    Mr. Noeldner has no evidence or personal knowledge to support any claim of wrongdoing against Officer Scoles. (Dkt. No. 41, p. 88-90.)

213.    Mr. Noeldner has no evidence or personal knowledge to support any claim of wrongdoing against Officer Bernas. (Dkt. No. 41, p. 90-92.)

214.    Mr. Noeldner has no evidence or personal knowledge to support any claim of wrongdoing against Officer Sackman. (Dkt. No. 41, p. 92-93.)

215.    Mr. Noeldner was aware that his inmate text messages were being monitored, but he has no personal knowledge of how they were monitored. (Dkt. No. 41, p. 101.)

216.    Officer Bernas knew that other officers also received and handled medication requests from Plaintiff, so they were not directed solely to Defendant Cheever. (Dec. of Bernas, ¶ 34.)

217.    Mr. Noeldner and Defendant Cheever would not "talk freely" when someone else was in the control pod with Defendant Cheever. (Dkt. No. 41, p. 59-60.)

218.    Mr. Noeldner has no idea whether or what other officers heard of his intercom conversations with Defendant Cheever. (Dkt. No. 41, p. 90, 92-93.)

219.    At minimum, officers reviewing the text messages between Mr. Noeldner and Defendant Cheever would have needed to "read into them" to suspect that the texts were being sent to and from Defendant Cheever. (Dkt. No. 41, p. 101.)

220.     Mr. Noeldner purposely asked officers other than Defendant Cheever for medications "to make it look like I was still asking when [Defendant Cheever] wasn't working… [in order] to cover—try to cover the fact that I was only asking when she was on [duty]." He requested medications from "numerous guards," including Officer Bernas. (Dkt. No. 41, p. 33.)

221.     Mr. Noeldner was familiar with TCJ's jail rules. (Dkt. No. 41, p. 105.)

222.     Mr. Noeldner knew contemporaneously that his contact with Defendant Cheever would constitute sexual misconduct under the applicable inmate rules and jail policies. (Dkt. No. 41, p. 105.)

223.     Mr. Noeldner knew contemporaneously that speaking with Defendant Cheever on the intercom was inappropriate. (Dkt. No. 41, p. 124.)

224.     Defendant Cheever notified and informed Mr. Noeldner "quite a few times" that their physical contact was not allowed. (Dkt. No. 41, p. 141.)

225.     Mr. Noeldner never made any attempt to report the sexual abuse perpetrated by Defendant Cheever and instead decided to "let[ ] the situation play out." (Dkt. No. 41, p. 110.)

226.     Mr. Noeldner knew about PREA and what it meant before the relevant time period, because he learned about it during one or more prison stays in 2015 or 2016. (Dkt. No. 41, p. 152-153.)

227.     Mr. Noeldner knew contemporaneously that the sexual contact with Defendant Cheever was not allowed and he knew he could report it. (Dkt. No. 41, p. 105-106.)

228.   Mr. Noeldner entered Defendant Cheever's contact information name on his jail-issued iPad as "Lovey." (Dkt. No. 41, p. 22.)

Dated this 31st day of May, 2022.

> CRIVELLO CARLSON, S.C.
> Attorneys for Defendants, Taylor County, Bruce Daniels, Sheriff Larry Woebbeking, Logan Coles, Aaron Bernas, Rhonda Sackman and Wisconsin County Mutual Insurance Company
>
> BY:    s/    Sara C. Mills
>
> SAMUEL C. HALL, JR.
> State Bar No. 1045476
> SARA C. MILLS
> State Bar No. 1029470
> CRIVELLO CARLSON, S.C.
> 710 N. Plankinton Avenue, Suite 500
> Milwaukee, WI 53203
> Phone: (414) 271-7722
> Fax: (414) 271-4438
> E-mail:  shall@crivellocarlson.com
>             smills@crivellocarlson.com