IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

COLE NOELDNER,

                              Plaintiff,                          OPINION AND ORDER

        v.                                                       21-cv-244-wmc

TAYLOR COUNTY, BRUCE DANIELS
(Former Sheriff of Taylor County),
SHERIFF LARRY WOEBBEKING,
LOGAN SCOLES, AARON BERNAS,
RHONDA SACKMAN, JOHN DOES 1–10
and BAILEE CHEEVER,

                              Defendants.

While plaintiff Cole Noeldner was incarcerated at Taylor County jail, a then
correctional officer, Bailee Cheever, entered into what both describe as a "romantic," yet
illegal, sexual relationship. After Cheever's supervisors discovered the relationship, her
employment was terminated and she subsequently pleaded no contest to third degree
sexual assault of Noeldner. He then filed this lawsuit, accusing Cheever and other
individual jail officials of violating his rights under the U.S. Constitution and state law.
Noeldner also contends that Taylor County should be liable for Cheever's and the other
county officials' actions for failing to adopt clear procedures for reporting suspected
improper behavior by jail staff.

Now before the court is defendant Cheever's motion for summary judgment in
which she contends that all of Noeldner's federal constitutional claims should be dismissed
because he failed to exhaust his jail remedies before filing this lawsuit. (Dkt. #35.) The
other defendants have also moved for summary judgment on all of Noeldner's claims on

their merits.  (Dkt. #48.)  Defendant Cheever's motion will be denied because she has not shown that Noeldner had administrative remedies available to him at the time he realized his injury.  However, the other defendants' motion will be granted because the individual defendants are entitled to qualified immunity, and Noeldner has failed to submit evidence from which a reasonably jury could conclude the county should be liable for Cheever's illegal conduct.  Finally, because Noeldner's remaining claims are solely against Cheever, the court will hold an *ex parte* telephonic status conference with Cheever and her attorney, Andrew Smith, before ruling on Smith's pending motion to withdraw as counsel.  (Dkt. #79.)

UNDISPUTED FACTS[1]

**A. The Parties**

Plaintiff Cole Noeldner was incarcerated in defendant Taylor County's jail from April 2018 to February 2019.  Defendant Bailee Cheever was a corrections officer and worked the night shift at the jail during the relevant time period.  Defendants Logan Scoles, Aaron Bernas and Rhonda Sackman were also corrections officers at the jail during this period.  Finally, defendant Larry Woebbeking was the Chief Deputy at the time, and is now the Taylor County Sheriff.[2]

---

[1] In this section, the court provides an overview of the facts, which are undisputed except where noted.  Additional facts are discussed as they become relevant to the analysis in the opinion below.

[2] Defendant Bruce Daniels was the Taylor County Sheriff during the relevant time period, but plaintiff withdrew his claims against Daniels in his summary judgment briefing (Plt.'s Opp. Br. (dkt. #62) 11), so the court will not discuss Daniels further in this opinion.  Plaintiff further named John Does 1–10 in the caption of his complaint, but failed to identify any Doe

**B. Jail Policies**

During the relevant time period, Taylor County jail had adopted several policies that prohibited sexual relationships between inmates and jail staff.  First, the jail had a Prison Rape Elimination("PREA")  policy in place that established a zero-tolerance policy for sexual misconduct at the jail.  (Dkt. #54-4; Dkt. #57-1.)  The policy defines "sexual misconduct" as "any behavior of a sexual nature directed toward an inmate, detainee, victim, witness, complainant or offender," including but not limited to "sexual assault, sexual abuse, sexual harassment, sexual contact, conduct of a sexual nature of implication, . . . [and] conversations or correspondence that suggests a romantic or sexual relationship." (Dkt. #57-1 at 1.)  The policy further states that "[a]ny type of consensual sexual activity or contacts" between inmates and staff is prohibited, "even when no objections are raised." (*Id.* at 2.)  Under the policy, any staff member who knows "or reasonably suspects that any employee may be involved in sexual misconduct" is required to report it to jail administration.  (*Id.*)

Second, the jail had a separate policy specific to staff and inmate contact, which prohibits staff from becoming "overly familiar" with inmates, engaging in "sexual acts or salacious conversations" or exchanging inappropriate notes or letters with inmates.  (Dkt. #54-1.)

Third, the jail's Standards of Conduct states that employees would be disciplined for soliciting or engaging in on-duty sexual activity with inmates or for failing to promptly

---

defendants, so they will be dismissed as well.  The clerk's office should revise the caption accordingly.

report activities that "may result in criminal prosecution or discipline under this policy" *or* that staff "knows or reasonably should know is unbecoming of a member of this agency, is contrary to good order, efficiency or morale, or tends to reflect unfavorably upon this office or its members." (Dkt. #54, ¶¶ 27–28.)

Fourth, the jail's inmate rules state that the jail had "zero tolerance for sexual abuse/misconduct," and that inmates "may report sexual misconduct/abuse verbally to any staff member, in writing to any staff member, [and] may report anonymously." (Dkt. #38-4.) As do other inmates, Noeldner received a copy of these rules when booked into the jail, and he was also told verbally about the jail's zero tolerance sexual misconduct policy during the booking process. In addition, during the relevant time period, "Zero Tolerance" posters were printed in English, Spanish, and Hmong, then posted in multiple locations throughout the jail, including inmate living areas.

## C. Officer Training

Newly hired jail corrections officers are required to participate in a six-week period of field training, during which the newly hired officer shadow and train under one or more designated field training officers. During field training, new corrections officers are instructed on appropriate interactions and relationships with citizens in general, with other department members and with inmates. This included: training on the jail's PREA policy, the staff and inmate contact policy; how to prevent and detect sexual misconduct at the jail; and how to avoid fraternization with inmates. All new corrections officers are also specifically instructed that sexual contact of *any* kind between an inmate and a corrections officer is prohibited by the jail's policies and state law, even if the contact appears to be

4

consensual.  In addition to new officer training, corrections officers receive informal, periodic reminders and inservice training emphasizing the importance of avoiding fraternization and about the jail's PREA policies.

Defendant Officer Cheever field-trained several officers, including defendants Officers Sackman and Bernas.  Cheever had a reputation among other corrections officers at the jail for being kind and respectful to inmates, and being a particularly good listener. Cheever frequently let inmates vent to her, and she told both Sackman and Bernas during field training that she thought it was important to let inmates talk so that they felt respected and heard.  During field training, Officers Sackman and Bernas both witnessed Cheever speaking at length with many inmates, and both thought that her approach was effective in many situations.  On one occasion, Bernas observed Cheever sit with a female inmate who was having a panic attack for over an hour, calmly talking the inmate through it.  In Bernas's opinion, Cheever's approach not only displayed kindness and respect for the inmate, it also helped the jail run smoothly.  At the same time, Cheever warned trainees against fraternization with inmates, and told Officer Sackman in particular to avoid certain actions that might be misinterpreted by inmates as indications of friendship or personal interest.  Cheever also told Sackman not to dress up too much or look too "made up" while on duty, because as female corrections officers, their job was to maintain the safety and security at the jail, not to impress anyone.

### D.  Noeldner and Cheever's relationship

Noeldner was first booked into Taylor County jail on April 28, 2019.  During the first several months of his incarceration, he spoke often with defendant Cheever about his

5

criminal cases and other stress in his life.  He spoke to her when Cheever conducted rounds and by calling the jail intercom, which was a telephone located near Noeldner's bunk in the dayroom.[3]  This telephone rang directly to the control pod, which was located in the center of the jail and contained all of the jail's surveillance cameras, so Noeldner would use it when Cheever was working there.  When Noeldner called to talk about his problems, Cheever generally listened to him and tried to provide feedback or guidance.

Starting in July 2018, however, Cheever and Noeldner's conversations became more frequent, with Noeldner calling Cheever on the intercom nearly every time she worked and they sometimes spoke for 30 minutes to an hour or more.  By August 2018, Cheever and Noeldner's conversations had become friendly and flirtatious in tone.  Noeldner also started calling Cheever frequently to request over-the-counter medications, and instead of simply delivering the medications to him, Officer Cheever would escort Noeldner to the medication room with her.  Noeldner and Cheever were friendly and flirtatious during these short trips as well.  Sometime in mid-August 2018, Noeldner also passed Cheever a romantic letter by hiding it under a request sheet.  Cheever then began sending Noeldner text messages to his jail-issued iPad.

This iPad allowed Noeldner to send and receive text messages for a fee, with some restrictions.  In particular, inmates could not use the device to contact or communicate

---

[3] The intercom system was supposed to be limited to emergencies, but inmates frequently used the phone at all hours of the day and night to contact the control pod about relatively mundane issues, including to ask questions about the date of their next court hearing, whether they had a visitor, and whether they could have additional supplies.

with other inmates, witnesses, or anyone with a court-issued no-contact order.  Inmates were informed that all text messages sent and received were recorded and subject to review by jail officials.  However, inmate text messages were not considered inappropriate or illegal simply because they were sexual in tone or topic.  Rather, corrections officers would flag a text message as inappropriate if it involved:  threats or harassment; attempts to violate probation, court orders, or the law; attempts to coordinate the sending or receipt of contraband; or provided information that could jeopardize the safety and security of the jail.  Further, in reviewing inmate text messages, corrections officers were able to see: whether the message was incoming or outgoing; the date and time the message was sent or received; the participating inmate's name; the participating inmate's designated texting phone number; the status of the text (whether it was sent or if it was rejected by the outside recipient); the outside party's phone number; the outside party's name as designated by the inmate; and the content of the text.

Officer Cheever knew that inmate text messages were routinely monitored and reviewed by corrections officers; and she knew if anyone discovered that she was texting with Noeldner, she would be disciplined.  Accordingly, Cheever installed a texting app on her phone that would send her text messages from randomly assigned phone numbers, so that her phone number would not show up on Noeldner's records.  Cheever also texted only when she was alone so that no one would ask who she was texting; she did not use her real name when texting Noeldner; and Noeldner entered Cheever's contact information name on his iPad as "Lovey."  Cheever put money into Noeldner's iPad texting account by

using prepaid debit cards, so that charges to her credit card relating to Noeldner's iPad would not show up on her or Noeldner's account.

By approximately the end of August 2018, Cheever and Noeldner had kissed and engaged in "flirtatious touching" while in the medication room together.   Cheever instructed Noeldner how and where to stand in the medication room so that they would not be seen on surveillance cameras.   By the beginning of September 2018, Cheever's intercom conversations with Noeldner were becoming longer in duration and more frequent, and were sometimes sexual in nature.   By mid-September, Cheever and Noeldner had engaged in sexual touching, including sexual intercourse in the medication room on September 10.

At all times, Officer Cheever knew that her conduct was both prohibited by jail policies *and* was illegal under state criminal laws.   Accordingly, Cheever told Noeldner that she wanted to keep their relationship secret, and that she would be disciplined or terminated if the relationship were discovered.   Noeldner agreed not to tell anyone about their relationship.   Each time they had sexual contact, Cheever also made sure that her uniform was in place and tidy before she left the medication room so that no one would have any reason to suspect the true nature of their interactions.

### E.   Defendants' Concerns and Cheever's Termination

Nevertheless, in early to mid-September 2018, Officer Sackman, who worked the night shift with Cheever, had become concerned about the frequency and duration of Cheever and Noelder's contacts and conversations.   Sackman then approached Officer Scoles, reporting her concerns that Noeldner appeared to be "overly friendly" with

8

Cheever.  Specifically, Sackman reported that Cheever and Noeldner occasionally engaged in longer and more frequent conversations on the intercom than typical, and she overheard them talking about things like recent Packers games and Cheever's weekend plans.  At that point, Officer Sackman did not think that their conversations were sexual or flirtatious in nature, nor had she seen any unusual or unexpected physical contact between them, but still thought that the conversations were too casual and frequent to be appropriate between a correctional officer and inmate.

Although advised of Sackman's concerns, Officer Scoles did not work the same shift as Officer Cheever, rarely interacted with her, and never observed an interaction of *any* kind between Cheever and Noeldner.  While he agreed that Sackman's descriptions of their interactions seemed unprofessional, he was uncomfortable making any presumptions about Officer Cheever in light of the minimal, subjective and speculative nature of information solely relayed by Sackman, especially since Scoles had not personally witnessed any of it.  Accordingly, Scoles told Sackman to inform a Correctional Sergeant about Cheever's conversations with Noeldner if she felt it warranted.

Around the same time, Officer Bernas separately noticed that Noeldner:  called the control pod on the intercom more often when Officer Cheever was working; seemed to take on a very friendly and casual tone with Cheever; and asked Cheever for Tylenol from the medication room more frequently than he asked other officers on duty.  Bernas was also worried that Cheever's openness with inmates could make her a target for inmates hoping to manipulate officers.  In particular, Bernas was concerned that Noeldner was attempting to manipulate Cheever to obtain favors, like extra food, better housing assignments, or

9

more freedom and privileges.  Bernas was also worried that long trips to the medication room with an inmate could jeopardize Officer Cheever's safety.

Officer Bernas then asked another officer, Jason Ray, about his concerns, and more specifically, whether Noeldner had a medical condition that required frequent use of Tylenol.  In response, Officer Ray confirmed that:  Noeldner frequently requested Tylenol on the night shift; Officer Cheever usually volunteered to get the Tylenol for him from the medication room; and Cheever's trips to the medication room seemed to take a long time. After talking with Ray, Bernas next approached Officer Scoles as well, telling him that Noeldner:  seemed to be focusing his attention on Officer Cheever; might be manipulating Cheever; and trips to the medication room by Cheever and Noeldner took longer than necessary.  Still, Bernas noted that he had not personally seen anything occur between Noeldner and Cheever that would rise to the level of misconduct, even though he was worried about Cheever's safety in the medication room and asked for advice on how to handle things.

After speaking with Scoles, Officer Bernas also approached Officer Cheever directly about his concerns, including that he had noticed Noeldner:  calling the control pod more often when she was working; telling Cheevers that he thought she was taking longer than it should for her to get Tylenol for Noeldner from the medication room; and he was concerned about the potential for Noeldner to manipulate Cheever, as well as for her safety. Bernas then asked Officer Cheever to have Noeldner stand in the hall, where he would be visible on the surveillance cameras when getting Tylenol for him.  Cheever not only agreed

10

to do so, but told Bernas that the trips to the medication room were taking a little longer because Noeldner was feeling depressed and said it helped to talk through things with her.

On September 17, shortly after Officer Bernas spoke with Officer Scoles, Officer Sackman approached Scoles again.  She reported that she had been watching Noeldner and Cheever since speaking to him, and she had noticed that Cheever was dressing better and wearing more makeup then she had done before.  She also noted Cheever had started to watch the camera feeds from Noeldner's cell block frequently, and had seen what she thought could be "suspicious looks" between Cheever and Noeldner.  Even then, Officer Sackman reported seeing nothing sexual or flirtatious between Cheever and Noeldner, and she was unsure whether she might be jumping to conclusions.

In light of Officer Bernas's and her concerns, Officer Scoles told Sackman that they should check camera footage to see if there was any objective evidence of lengthy intercom conversations or long trips by Cheever and Noeldner to the medication room. After reviewing surveillance footage from several recent, random dates, Officers Scoles and Sackman confirmed that Cheever had recently made frequent, lengthy visits to the medication room where she would meet Noeldner, then the two would move out of camera view.  In addition, they confirmed that Cheever and Noeldner had engaged in multiple, lengthy intercom conversations.  As a result, Scoles and Sackman agreed that the situation should be reported to their supervisors, and that same day, September 18 at 8:06 p.m., Officer Scoles sent an email to Taylor County Jail Administrators about the observations and concerns raised by Officers Sackman and Bernas.  Scoles identified six specific excerpts from surveillance footage that Sackman and he reviewed showing intercom conversations

between Officer Cheever and Noeldner ranging in length from 13 to 45 minutes and two trips to the medication room lasting 9 minutes each.

Chief Deputy Larry Woebbeking responded to Scoles's email a few minutes later, thanking him for the information, confirming that his sending the email was appropriate, advising that he would look into their concerns further, and asking Scoles to keep the matter confidential.  Then Taylor County Sheriff Bruce Daniels responded separately to Woebbeking by email that night, stating that they should meet in the morning to determine their next steps.   The following morning, Sheriff Daniels, Chief Deputy Woebbeking and Sergeant Angie Becker met to discuss Officer Scoles's email.  Woebbeking directed Sergeant Becker to review camera footage and Noeldner's text messages.  Becker reported back to Woebbeking that same day, stating that she found a significant number of text messages beginning on August 15, 2018, between Noeldner and a person with another name and phone number than Cheever's.  However, based on the context of the texts, which were romantic or sexual in nature, Becker told Woebbeking that she suspected the text messages were from Cheever, even though the sender was identified using multiple names and phone numbers.  Sergeant Becker also told Woebbeking that control pod footage showed Cheever talking to Noeldner on the intercom with Cheever stopping the conversations when other officers were nearby, then resuming the conversations once the officers were no longer in the hall.

Chief Deputy Woebbeking also called Officer Cheever and arranged to meet her later that night, still on September 19.  Sheriff Daniels and Chief Deputy Woebbeking also notified Taylor County's Human Resources Director and Corporation Counsel about the

12

situation.  A decision was also made that an outside agency should conduct an investigation, prompting Woebbeking to contact Marathon County Sheriff's Office to request their assistance, which they agreed to provide.

Chief Deputy Woebbeking proceeded to meet with Officer Cheever as planned at 8:00 p.m. on September 19 at the sheriff's office.  Woebbeking gave Cheever a letter signed by Sheriff Daniels stating that she was relieved of duty with pay pending the completion of an investigation into allegations that she had engaged in misconduct involving inappropriate contact with an inmate.  Woebbeking also told Cheever that the Marathon County Sheriff's Office would be conducting the investigation and that someone from that office would be in contact with her.  At the time, Officer Cheever was surprised that her relationship with Noeldner had been discovered, as she had told no one about it and did not think anyone even suspected the existence of an improper relationship.  The next day, Cheever resigned from her position.  She later pleaded no contest to one count of sexual assault of Noeldner in violation of Wis. Stat. § 940.225(3)(a).

Prior to this incident, Cheever had never been suspected of, accused of, or disciplined for any kind of inappropriate contact or conduct with an inmate, and no corrections officer at the Taylor County Jail had ever been accused of, investigated for, or disciplined for engaging in sexual contact or conduct with an inmate.


OPINION

Plaintiff asserts the following claims in his amended complaint:  (1) defendant Cheever violated his rights under the Fourteenth Amendment and state law by sexually

13

abusing him at the jail; (2) defendants Sackman, Scoles and Bernas violated his Fourteenth Amendment rights by failing to protect him from Cheever's sexual abuse; (3) defendant Woebbeking failed to train and supervise jail staff adequately regarding PREA policies and reporting obligations;  (4) Taylor County failed to establish adequate policies to prevent, detect and report sexual abuse by staff; and (5) Taylor County is obligated to indemnify the individual defendants under state law.  Defendant Cheever has moved for summary judgment solely on the ground that plaintiff failed to exhaust his jail remedies before filing this lawsuit, while the remaining defendants have moved for summary judgment on the merits of all of plaintiff's claims against them.  The court will address Cheever's motion first, followed by the remaining defendants' motion.

## I.  Exhaustion of Jail Remedies

A plaintiff who is confined in jail or prison when he files his lawsuit, and who is challenging jail or prison conditions, must exhaust all available administrative remedies before filing suit in federal court.  42 U.S.C. § 1997e(a).  This means that the prisoner must take all steps within the administrative process, including filing an initial grievance and pursuing all necessary appeals. *Burrell v. Powers*, 431 F.3d 282, 284-85 (7th Cir. 2005); *Pozo v. McCaughtry*, 286 F.3d 1022, 1025 (7th Cir. 2002).  However, inmates are required to exhaust only those administrative remedies that are available to them, *Kaba v. Stepp*, 458 F.3d 678, 684 (7th Cir. 2006), and courts may not hold plaintiffs to exhaustion procedures of which they are not made aware.  *See Lanaghan v. Koch*, 902 F.3d 683, 689 (7th Cir. 2018) ("A secret grievance procedure is no procedure at all, at least absent some evidence that the inmate was aware of that procedure."); *White v. Bukowski*, 800 F.3d 392,

14

397 (7th Cir. 2015) (recognizing that "[p]risoners are required to exhaust grievance procedures they have been told about, but not procedures they have not been told about"). Finally, failure to exhaust administrative remedies under § 1997e(a) is an affirmative defense that must be proven by the defendant. *Davis v. Mason*, 881 F.3d 982, 985 (7th Cir. 2018).

Taylor County jail's grievance procedures are minimal. The jail rules state that inmates "may request an inmate grievance form if they believe they have been treated unfairly." (Dkt. #38-4 at 6.) The rules further state that the grievance "should be given to jail staff to forward to the jail sergeant," who will respond within 10 working days. If the inmate is not satisfied with the sergeant's response, he may appeal by writing to the chief deputy. (*Id.*)

Notably, the grievance procedure does not include a deadline for filing initial grievances. Nevertheless, defendant Cheever argues that because plaintiff failed to file any jail grievance complaining about her misconduct while he was incarcerated at the Taylor County jail, he failed to exhaust his administrative remedies. In response, plaintiff concedes that he did not file any jail grievances about Cheever's actions, but argues that he did not have to file a jail grievance about Cheever's sexual misconduct because there were no remedies available to him. The court agrees with plaintiff on several, independent grounds. First, Cheever fails to address the fact that one of the reasons plaintiff did not report Cheever's sexual misconduct to anyone, let alone jail staff, was because Cheever told him not to do so. It is well established that an inmate cannot be faulted for failing to file a grievance if he was told not to by jail staff. *See Hernandez v. Dart*, 814 F.3d 836, 842

(7th Cir. 2016) (administrative remedies are unavailable if staff's "affirmative misconduct" prevents prisoners from pursuing administrative remedies).

Second, Cheever fails to address plaintiff's arguments adequately that the nature of his claim for sexual abuse changes the exhaustion analysis.  According to plaintiff, he did not realize until sometime later that:  (1) Officer Cheever's actions constituted a crime on its face, whether or not he believed he had consented; and (2) he had been mentally and emotionally damaged by her crime.  Moreover, by the time he did understand the nature of and damage cause by Cheever's actions, they were already known by jail administration, Cheever had resigned, an outside agency had conducted a criminal investigation, and Cheever had been criminally charged.  In response, Cheever fails to explain how the jail's minimal grievance policy begins to account for a situation like this one.  Notably, the jail's policy does *not* say that plaintiff could have filed a grievance after he was released from Taylor County jail in February 2019, only to be reincarcerated in state prison.  Plaintiff cannot be faulted for failing to file a grievance after his release when the jail's policy provides no instructions for how he could have done so.  *See Ramirez v. Young*, 906 F.3d 530, 535 (7th Cir. 2018) ("Prisoners are not expected to divine the availability' of grievance procedures.") (citation omitted); *Vasquez v. Hilbert*, No. 07-cv-723, 2008 WL 2224394, at *4 (W.D. Wis. May 28, 2008) ("[W]hen prison officials fail to 'clearly identif[y]' the proper route for exhaustion, they cannot later fault the prisoner for failing to predict the correct choice.") (quoting *Westefer v. Snyder*, 422 F.3d 570, 580 (7th Cir. 2005).)

Third, Cheever has failed to identify any *remedy* that plaintiff could have obtained by filing a grievance.  Inmates are required to exhaust "administrative remedies" before filing suit in federal court, 42 U.S.C. § 1997e(a), but an administrative remedy is "available" only if it is "capable of use for the accomplishment of a purpose." *Ross v. Blake*, 578 U.S. 632, 643 (2016).  Thus, inmates are not required to use a grievance process that could provide them *no* remedy at all.  *Id.*  As the Seventh Circuit has asked: "How could a prisoner be expected to file a grievance that would be academic because no response would benefit him or her in the slightest?"  *White*, 800 F.3d at 394–95.  That appears to be the situation in this case.  Cheever fails to identify *any* remedy that plaintiff could have obtained by filing a jail grievance.

Cheever argues that "futility" is not an excuse for failure to exhaust available administrative remedies, which is true enough.  *Booth v. Churner*, 532 U.S. 731, 736 (2001).  However, in *Booth,* the Supreme Court held that an inmate had to file an administrative grievance before suing in federal court because -- even though he wanted and could not obtain money damages from the prison -- the inmate could obtain *some sort of relief*, such as injunctive relief.  *Id.* at 734. However, the Supreme Court went on to acknowledge that if the "relevant administrative procedure lacks authority to provide any relief or to take any action whatsoever in response to a complaint," then the inmate has no available administrative remedies.  *Id.* at 736; *see also Ross*, 578 U.S. at 643 (grievance procedure "not available when (despite what regulations or guidance materials may promise) it operates as a simple dead end – with officers unable or consistently unwilling to provide any relief to aggrieved inmates"); *Thornton v. Snyder*, 428 F.3d 690, 696 (7th Cir. 2005)

(inmate had no available administrative remedies where he had already received what he could request through grievance process).  "In short, if one has no remedy, one has no duty to exhaust remedies."  *White*, 800 F.3d at 395.  Here, Cheever does not argue that plaintiff could have obtained monetary damages, injunctive relief, or any other remedy by filing a jail grievance, which suggests that no remedy was available.

Fourth, Cheever also fails to address the fact that inmates in Taylor County jail are *not even required* to follow the jail's grievance policy to complain about sexual assault or harassment.  Instead, the jail rules simply state that inmates *may* "report sexual misconduct/abuse verbally to any staff member, in writing to any staff, [and] may report anonymously."  (Dkt. #38-4 at 7.)  Similarly, the jail's PREA policy states that inmates may report sexual misconduct directly to staff, which will then investigate as necessary.  (Dkt. #57-1 at 3–4.)  Reports of sexual assault and abuse also may be reported anonymously to a public or private entity not part of the sheriff's office.  (Dkt. #54-1 at 4.)  The purpose of PREA reporting rules is different from the purpose of the standard jail grievance procedures.  Standard grievance procedures give the jail an opportunity to investigate and address an inmate's complaints before the inmate brings a lawsuit.  In contrast, PREA exists to "protect the inmates of Taylor County Jail from sexual misconduct," and the flexible reporting rules "ensure that sexual misconduct, harassment, or inappropriate behaviors are reported immediately, accurately, and completely."  (*Id.* at 1.)  In this instance, staff learned about Cheever's sexual misconduct and undertook an investigation because Cheever's coworkers reported the suspected misconduct.  Thus, the

18

purposes of the PREA reporting obligations were satisfied without plaintiff having to file his own report.

In sum, Cheever has failed to show that any administrative remedies were available to plaintiff, so her motion for summary judgment will be denied.  *See Davis v. Mason*, 881 F.3d 982, 985 (7th Cir. 2018) ("it was not [plaintiff's] burden to establish that the grievance process was unavailable; it was the officers' burden to show that [plaintiff] did not exhaust available remedies").

## II. Remaining Individual Defendants

Plaintiff contends that defendants Sackman, Bernas and Scoles violated his constitutional rights by failing to intervene and protect him from Officer Cheever's sexual abuse crimes.  He also contends that Chief Deputy Woebbeking violated his rights by failing to adequately train and supervise the other individual defendants.  Because plaintiff was a pretrial detainee during the relevant time period, his failure-to-protect and failure-to-supervise claims arise under the Fourteenth Amendment's Due Process Clause.  *Thomas v. Dart*, 39 F.4th 835, 841 (7th Cir. 2022).

To succeed on his failure-to-protect claims against Sackman, Bernas and Scoles, plaintiff must show: (1) that a reasonable corrections officer in defendants' position would have recognized that Cheever posed a substantial risk of harm to plaintiff; and (2) that defendants acted unreasonably in failing to protect plaintiff from Cheever's abuse.  *See Kemp v. Fulton County*, 27 F.4th 491, 496–97 (7th Cir. 2022) (setting forth elements of pre-trial detainee's failure-to-protect claim).  To succeed on his claim against Woebbeking,

plaintiff must show that Woebbeking likewise acted objectively unreasonably in failing to adequately train and supervise jail staff. *Id.* It is not enough to show that defendants' actions were negligent or even grossly negligent. *See Williams v. Ortiz*, 937 F.3d 936, 942 (7th Cir. 2019) (citing *McCann v. Ogle Cty.*, 909 F.3d 881, 886 (7th Cir. 2018)).

Defendants argue that plaintiff's claims fail because he has not submitted evidence from which a reasonable jury could conclude that their actions were objectively unreasonable. Alternatively, they argue that even if they violated plaintiff's Fourteenth Amendment rights, they are entitled to qualified immunity. The Supreme Court has cautioned lower courts to "think hard, and then think hard again" before addressing the merits of an underlying constitutional claim when a defendant has raised a qualified immunity defense. *District of Columbia v. Wesby*, 138 S. Ct. 577, 589, n.7 (Jan. 22, 2018) (citing *Camreta v. Green*e, 563 U.S. 692, 707 (2011)). While the individual defendants (particularly the rank and file officers) appear to have the better of the argument at summary judgment on the merits as well, therefore, the court will start by addressing qualified immunity.

Even in cases with plainly bad outcomes, qualified immunity protects government officials from personal liability provided that "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). A law is "clearly established" if the law was sufficiently clear at the time of the officer's conduct that "every reasonable official would understand" the conduct "is unlawful." *Wesby*, 138 S. Ct. at 589 (internal quotation marks and citations omitted).

In other words, "existing law must have placed the constitutionality of the conduct 'beyond debate.'" *Id.* This doctrine balances "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.* "When properly applied, it protects all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (internal quotation marks omitted).

Applying this standard, the court concludes that defendants Bernas, Sackman, Scoles and Woebbeking are entitled to qualified immunity. Specifically, there was (and still is) no clearly established law that the Fourteenth Amendment required these defendants to do more to protect plaintiff than they did, at least with the information known to them at the time. Certainly, as plaintiff argues, the current law requires an officer who is aware that the inmate is facing a risk of serious harm to intervene to prevent another officer from inflicting that harm, assuming a realistic opportunity to intervene. (Plt.'s Br. (dkt. #62) 17) (citing *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994).) However, the qualified immunity analysis requires a "high degree of specificity." *Wesby*, 138 S. Ct. at 590 (citations omitted). This means that the question is not simply whether officers have a duty to protect inmates or a duty to intervene to prevent another officer from harming an inmate; rather, the relevant question for qualified immunity is whether "the official acted reasonably in the particular circumstances that he or she faced." *Id.* (citations omitted.)

With respect to Officers Bernas and Sackman, the evidence would allow a reasonable jury to infer they knew by early September 2018, that: (1) Officer Cheever was

21

a well-respected officer who had trained them in jail policies regarding inmate fraternization and PREA, including on the importance of setting boundaries with inmates; (2) Cheever had a reputation for both professionalism *and* an ability to communicate effectively with inmates; (3) they had begun to observe frequent and lengthy conversations between Cheever and plaintiff, as well as frequent and lengthy trips to the medication room; (4) some of those conversations were informal and involved personal matters, such as Cheever's weekend plans; (5) they heard no conversations between Cheever and plaintiff that were flirtatious or sexual; and (6) they had observed no inappropriate physical contact between Cheever and plaintiff, nor (at that time) been aware either was moving to avoid being filmed while in the medication room.  As for Officer Scoles, he learned all of this information secondhand from Bernas and Sackman no earlier than September 2018.

Yet plaintiff identifies no clearly established law that directed Bernas, Sackman or Scoles to take specific actions based on this specific set of facts.  In particular, no reasonable jury could find on this evidence that these rank and file officers suspected or should have suspected Cheever presented a serious risk of harm to plaintiff at that time; nor could a reasonable jury conclude that a reasonable officer in these defendants' circumstances would have appreciated that Cheever presented such a risk.  Nonetheless, plaintiff argues that as soon as Bernas and Sackman "had suspicions and inklings that something between Cheever and Noeldner was amiss," they should have listened or paid closer attention to plaintiff's intercom usage, reviewed video camera footage, or reported their suspicions to their superiors.  (Plt.'s Br. (dkt. #62) 14.)  There are a number of responses to this argument, none of them helpful to plaintiff.  First, the record at summary judgment establishes that

the officers did all of these things, with the possible exception of going immediately to a jail administrator with their suspicions, rather than doing follow up investigation before taking it up the chain of command.  Perhaps with the benefit of hindsight, Bernas and Sackman should have immediately reported their suspicions to jail administrators.

This brings us to plaintiff's second problem:  hindsight is not to be part of a trier of fact's consideration.  Instead, the question is whether an officer's actions are objectively reasonable "from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015).  And on that basis, a reasonable jury would have to acknowledge a line officer's desire to do some investigation before accusing a more senior officer of inappropriate, much less criminal, behavior based on suspicion.  If anything, consulting another, objective line officer and doing some follow up investigation was not just reasonable but prudent under those circumstances.

Third, and most importantly for the purposes of this court's qualified immunity analysis, the defendants' actions did *not* violate clearly established law, and it was not objectively *un*reasonable for these defendants to discuss the situation with each other, and in Officer Bernas's case, with Cheever herself, as well as to gather more information, through observation and review of surveillance videos, before reporting their concerns to their superiors.  Most critically, none of the defendants ignored their concerns and suspicions, and as soon as they gathered information confirming there was a basis for their concerns, they immediately reported the information to their superiors, and Cheever was

23

then suspended the following day.  Thus, their actions were not unreasonable and did not violate clearly established law.

This leaves plaintiff's claim against defendant Woebbeking.  Plaintiff concedes that "there is no evidence that he actually knew what was going on between Noeldner and Cheever," but he argues that Woebbeking violated his constitutional rights because he failed to train and supervise his employees to report suspicions immediately about potential problems at the jail.  (Plt's Br. (dkt. #62) 15.)  In particular, he suggests that Officers Bernas, Sackman and Scoles were uncomfortable reporting their suspicions sooner because Woebbeking failed to train them to do so.  However, plaintiff has submitted no evidence to support his assertion that a lack of training or supervision had anything to do with the claims made in this lawsuit.  For example, he has submitted no evidence suggesting that jail employees would be retaliated against or disciplined for reporting suspicions about fellow employees, or that the jail had a culture of covering up employee misconduct.  Instead, the evidence shows that jail corrections officers were trained and instructed to report suspected misconduct and indeed, were *required* to do so.  And Woebekking's response to Scoles's email confirms this.  Indeed, Woebekking responded to Scoles's email immediately, thanking him for the information and noting that reporting was the right thing to do.  Thus, there is simply no evidence that Woebekking acted unreasonably in his training or supervision of jail employees.[4]  Nor with respect to qualified immunity, has

---

[4] Plaintiff also raised a failure to train claim against Woebekking under Wisconsin state law. However, for the reasons defendants explain in their summary judgment materials, that claim is barred by Wisconsin's discretionary immunity statute, Wis. Stat. 893.80(4), which grants immunity to public officers for discretionary actions taken within the scope of their

plaintiff shown that Woebekking violated any clearly established law relating to training and supervision.   Accordingly, individual defendants Bernas, Sackman, Scoles and Woebekking are entitled to summary judgment on plaintiff's Fourteenth Amendment claims against them.

## III.  Municipal Liability

Finally, plaintiff contends that Taylor County itself should be held liable for the constitutional violations committed against him because it lacked adequate policies regarding the reporting of suspected sexual assault.   In particular, he contends that the county needed clearer policies and training for: (1) inmates, regarding what qualified as sexual assault; (2) corrections officers, regarding when they should report suspected sexual assault; and (3) jail staff, in reviewing inmate text messages for evidence of sexual misconduct.   Plaintiff can succeed on his claim against the county only if he shows that: (a) the county's policies or practices caused his constitutional injuries; and (b) the county had notice that its policies, or lack thereof, would cause constitutional violations.   *Monell v. Dep't of Social Servs. of the City of New York*, 436 U.S. 658, 694 (1978); *J.K.J. v. Polk Cnty.*, 960 F.3d 367, 377, 379 (7th Cir. 2020); *Thomas v. Cook County Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010).   Unfortunately for plaintiff, he has not submitted evidence sufficient to satisfy these elements.

---

employment.  Woebekking's decisions regarding training and supervision of employees were clearly discretionary actions.

To begin, plaintiff has submitted no evidence suggesting that any alleged constitutional violations, including Cheever's misconduct, was the result of the county's ineffective training or policies relating to sexual misconduct and reporting obligations.  As discussed above, the county had adopted numerous policies establishing zero tolerance for sexual misconduct between staff and inmates, *and* it required staff to report suspected misconduct immediately.   Ironically, Officer Cheever was among those responsible for training new officers as to the importance of these policies, something the evidence shows she successfully impressed upon her fellow officers, if not herself.  Moreover, the evidence establishes that jail staff *did* report Cheever's suspected misconduct immediately after obtaining information sufficient to suspect an improper relationship between plaintiff and Cheevers.

In addition, plaintiff's own deposition testimony confirms that he did not need additional training to understand that a sexual relationship with a jail corrections officer was improper and should be reported.  During the relevant time period, he also admitted knowing that:  he could report PREA violations; sexual contact of any kind with a jail officer was prohibited; his contact with Cheever constituted sexual misconduct under the applicable inmate rules and jail policies; speaking with her on the intercom was inappropriate; and he could have reported any of Cheever's actions.  (Plt.'s Dep. (dkt. #41) 105–06, 124, 141, 152–53.)  Accordingly, there is simply no basis for inferring that the jail's PREA and reporting policies caused any alleged constitutional violation.

Nor is there evidence that the jail's policies regarding the monitoring of text messages caused the alleged constitutional violations.  Plaintiff argues that if jail staff was

26

monitoring inmate text messaging more closely, they would have realized that plaintiff was exchanging inappropriate text messages with a corrections officer.  However, plaintiff concedes that Cheever and he took numerous steps to conceal their text message exchanges, including by Cheever using computer generated, random phone numbers and false names. Plaintiff also fails to identify any *specific* text messages that should have alerted jail officials that Officer Cheever or some other jail officer was sending the messages.

Finally, even if plaintiff had shown that county policies caused a violation of his constitutional rights, there is no basis for finding that the county had notice that its policies, or lack thereof, would cause constitutional violations.  To satisfy this standard, plaintiff would need evidence showing that there was a "known or obvious" risk that constitutional violations would occur because of the county's policies or practices.  *Polk Cnty.*, 960 F.3d at 380 (7th Cir. 2020).  But going back at least as far as 2007, when Chief Deputy Woebbeking started in the position of chief deputy, no correctional officer employed at Taylor County jail had ever been accused of, investigated for, or disciplined as a result of engaging in sexual contact or conduct with inmates, or for engaging in *any* kind of sexually inappropriate contact or harassment, including exchanging any inappropriate text messages.  Similarly, during Officer Cheever's employment with Taylor County up until September 18, 2018, she was never suspected of, accused of, or disciplined for any kind of sexually inappropriate contact toward inmates or other jail staff.  To the contrary, she was considered to both model and teach effective and appropriate interactions with inmates.  Thus, there is simply no evidence that the county knew, or even should have known, that any of its policies would lead to the type of conduct that occurred

here.  Accordingly, the county is entitled to summary judgment on plaintiff's municipal liability claim.

## IV.  Indemnification against Taylor County

Finally, plaintiff brings a claim against Taylor County for indemnification under Wis. Stat. § 895.46 for any judgment against the only remaining defendant, Officer Cheever.  That statute indemnifies public employees for liabilities incurred while "acting within the scope of employment."  Defendants move for summary judgment on this claim as well, arguing that § 895.46 does not create a cause of action for anyone except the public employees themselves.  Defendants also argue that Taylor County would not be required to pay for any judgment entered against Cheever in any event, because Cheever was plainly *not* acting in the course and scope of her employment during the instances of sexual assault on plaintiff.

Defendants appear to be correct that § 895.46 may not create an independent cause of action for plaintiff, but that does not mean that plaintiff necessarily cannot pursue a claim of indemnification as a third-party beneficiary.  The more significant question is whether there are disputed issues of fact that would prevent the court from resolving the indemnification question at this stage, and in particular, whether there are disputed issues regarding whether defendant Cheever was acting within the "scope of employment" as a jail corrections officer when she engaged in sexual misconduct with plaintiff.

An act is within the "scope of employment" if it is a "natural" or ordinary "part or incident of the services contemplated."  *Martin v. Milwaukee Cnty.*, 904 F.3d 544, 555 (7th

28

Cir. 2018).   An *Id.* at 555 (paraphrasing Wisconsin state law).   On its face, Cheever's alleged sexual misconduct is the furthest thing from a natural or ordinary part of her contemplated service as a corrections officer, or at least should have been.   Indeed, an act falling with the scope must be "so closely connected with the employment objectives, and so fairly and reasonably incidental to them, that it may be regarded as a method, even if improper, of carrying out the employment objectives." *Id.* (emphasis added).   Accordingly, courts "must consider the employee's intent and purpose," and "[a]n act is not in the scope [of employment] if it is different in kind from that authorized, far beyond the authorized time or space, or too little actuated by a purpose to serve the employer." *Id.*

Consistent with this definition, the Seventh Circuit held in *Martin* that a prison guard's rape of a pregnant inmate did not occur within the "scope of employment" for indemnification under § 895.46 because the plaintiff "failed to offer any evidence [that] the sexual assaults were natural, connected, ordinary parts or incidents of" or otherwise similar to the defendant's job of guarding inmates.   *Id.* at 556.   Specifically, the court explained that since Milwaukee County expressly forbade sexual acts between guards and prisoners, it clearly did not contemplate sex with inmates as part of achieving its objectives in safeguarding prisoners.   *Id.* at 548, 555–56.   Moreover, "[t]he uncontested evidence showed [the defendant] did not subjectively intend in any way to benefit his employer." *Id.* at 556.

So, too, here.   Cheever's sexual abuse of an inmate plainly fell outside the scope of her employment because her actions could not reasonably be viewed as a means of serving *any* government objective, but rather as a means of serving her own personal interests.

29

Although Cheever's actions occurred during the time and space of her employment, no reasonable jury could find that her sexual misconduct was in the scope of her employment. Regardless, her actions were not natural or ordinary parts of her employment, were not improper or incidental methods of carrying out employment directives, and were not motivated by a purpose of serving the county.   Rather, the county strictly prohibited Cheever's actions.   Moreover, Cheever concedes in her declaration that her sexual contact with plaintiff was motivated by "purely personal interests," and she knew that her conversations, texting and sexual conduct with plaintiff was wrong, was prohibited by the county, and did not serve the interests of the county.   (Cheever Dec. (dkt. #44) ¶¶ 9, 13 40, 49, 50, 61, 66–69.)   Thus, she took pains to conceal those activities.

In response, plaintiff does not address defendants' arguments about Cheever's specific actions or employment.   Instead, plaintiff argues that the scope of employment question should be presented to a jury because it involves factual questions.   It does not, nor does plaintiff say what those facts might be.   If plaintiff thought that there were genuine disputes of material fact relevant to whether Cheever was acting within the scope of her employment, now was the time to identify them.   Because he has failed to do so, the county is entitled to summary judgment on Cheever's claim for indemnification.

## V.  Remaining Issues

For the reasons set forth above, the court is granting summary judgment on all of plaintiff's claims against defendants Bernas, Sackman, Scoles, Woebekking and Taylor County.   The court is also denying defendant Cheever's motion for summary judgment on

exhaustion.  Cheever did not move for summary judgment on the merits of plaintiff's claims against her, so those claims remain for trial at least technically.  Cheever's counsel, Attorney Andrew Smith, has filed a motion to withdraw as counsel on the ground that he was hired by Wisconsin County Mutual Insurance Corporation, which is no longer paying for Cheever's defense.  (Dkt. #79.)  In particular, the court recently granted WCMIC's unopposed motion for summary judgment, in which it argued that:  (1) there is no insurance coverage available to Cheever under the company's insurance policy with Taylor County; and (2) WCMIC has no duty to defend or indemnify Cheever for any of the claims asserted by plaintiff.

The court does not intend to require Attorney Smith to continue representing Cheever without compensation.  However, after Smith withdraws, Cheever will be facing a trial, scheduled to begin on October 31, 2022, as a pro se litigant.  Thus, before granting the motion to withdraw, the court must ensure that Smith has discussed Cheever's rights and options with her, and the consequences of his withdrawal, as well as taken steps to transfer the case ethically.  Thus, the court will schedule a telephonic status conference with Smith and Cheever to address Smith's motion.


ORDER

IT IS ORDERED that:

1) The motion for summary judgment filed by defendants and Taylor County (dkt. #48) is GRANTED.

2) Defendant Bailee Cheever's motion for summary judgment (dkt. #35) is DENIED.

3) The court reserves decision on Attorney Andrew Smith's motion to withdraw (dkt. #79).  An ex parte telephonic status conference will be held on Tuesday, September 27, 2022, at 11:00 a.m. with Attorney Smith and defendant Cheever. Attorney Smith shall initiate the call to the court, which can be reached at (608) 264-5084.

Entered this 21st day of September, 2022.

BY THE COURT:

/s/

WILLIAM M. CONLEY
District Judge